**UNITED STATES, Appellee,**

v.

**Richard W. CHAMBERLAIN,
Defendant, Appellant.**

No. 98–1324.

United States Court of Appeals,
First Circuit.

Heard Sept. 9, 1998.

Decided Nov. 3, 1998.

Jeffrey M. Silverstein, with whom Billings & Silverstein was on brief for appellant.

Margaret D. McGaughey, Assistant United States Attorney, with whom Jay P. McCloskey, United States Attorney, and James L. McCarthy, Assistant United States Attorney, were on brief for appellee.

Before TORRUELLA, Chief Judge, CAMPBELL, Senior Circuit Judge, and STAHL, Circuit Judge.

CAMPBELL, Senior Circuit Judge.

Richard Chamberlain appeals from his conviction in the United States District Court for the District of Maine on one count of possession of a firearm pursuant to 18 U.S.C. § 922(g)(4), which makes it unlawful for any person who has been "committed to a mental institution" to possess any firearm in interstate commerce. Under Maine law, Chamberlain had earlier been involuntarily admitted for five days, on an emergency basis, to a Maine mental hospital. Chamberlain moved to dismiss the federal information, contending that his involuntary emergency admission was not, as a matter of law, a "commitment" to a mental institution as required for conviction under § 922(g)(4). The district court denied the motion. Chamberlain entered a conditional guilty plea, reserving his right to challenge on appeal the denial of his motion to dismiss. He was sentenced to five years probation and ordered to pay a $100 assessment. This appeal followed. We affirm.

I.

On June 25, 1996, Chamberlain was involuntarily admitted, on an emergency basis, to the Acadia Hospital in Bangor, Maine pursuant to an application filed under a Maine statute, 34–B M.R.S.A. § 3863(1)-(3).[1] In the application seeking Chamberlain's involuntary admission, a clinician at Acadia stated that "Chamberlain has a mental illness and, due to mental illness, poses a likelihood of serious harm, on the basis that he put a loaded gun to his head and threatened his wife." The application further stated that

"suitable resources for care and treatment are unavailable in the community." Chamberlain was examined on June 25, 1996, by a licensed physician, who certified pursuant to section 3863 that Chamberlain posed a danger of serious harm due to mental illness because he "held a gun to his head tonight" and constituted a "[d]anger to [him]self and others." A judge of the Maine district court reviewed and endorsed the application and certification as being prepared in accordance with law, and ordered that Chamberlain be transported and admitted to Acadia for no more than five days, the maximum length of an emergency detention under section 3863.

After Chamberlain had been admitted to Acadia, a second physician examined him and completed a "24–Hour Certification Form." On the form, the physician certified that he had "examined [Chamberlain] and in my opinion the patient is mentally ill, and, due to his [ ] mental illness, poses a likelihood of serious harm to himself [ ] or others if discharged at this time." As grounds for the certification, the physician stated that Chamberlain had "put a gun to his head last evening with suicidal ideation" and "remains distraught today and constitutes a danger to [him]self."

A patient who has been detained for five days pursuant to section 3863 may thereafter remain at the mental hospital if (1) the patient voluntarily admits himself, see 34–B M.R.S.A. § 3831[2], or (2) the chief administrative officer of the mental hospital obtains from the state district court an "involuntary commitment order," see 34–B M.R.S.A. §§ 3863(5)(B), 3864.[3] After his initial five-day emergency detention, Chamberlain voluntarily admitted himself to Acadia on or about June 30, 1996, remaining there until his release on July 8, 1996. The chief administrative officer made no application in his case for an "involuntary commitment order."

On May 19, 1997, a police officer received a suicide/attempt to locate report from Cham-

---

1. Section 3863 has been reproduced, in part, in the Appendix following this opinion.

2. Section 3831 provides, in part: "A hospital for the mentally ill may admit on an informal basis for care and treatment of a mental illness any

person desiring admission of the adult ward of a legally appointed guardian...."

3. Section 3864 has been reproduced, in part, in the Appendix following this opinion.

berlain's brother. Chamberlain's brother told the officer that Chamberlain was upset over the breakup of his marriage, had stated that he had nothing to live for, and was suicidal. The officer located Chamberlain's pickup truck in an airport parking lot. Inside the truck were a loaded Remington .270 caliber rifle, a box of .270 caliber ammunition, and a Savage 30–30 caliber rifle. These items, which were manufactured outside the state of Maine, were seized and Chamberlain was arrested and charged in the federal district court with violation of 18 U.S.C. § 922(g)(4).

Chamberlain filed a motion to dismiss the information on the ground that he had not, as a matter of law, been "committed to a mental institution" within the meaning of § 922(g)(4). The federal district court denied the motion, and issued findings of fact and conclusions of law.

Chamberlain entered a conditional plea of guilty under Fed.R.Crim.P. 11(a)(2) to one count of unlawful possession of a firearm, reserving his right to appeal from the district court's denial of his motion to dismiss. The court sentenced Chamberlain to five years' probation and a mandatory $100 assessment.

## II.

■ This appeal raises a single legal issue: Whether Chamberlain's involuntary admission pursuant to 34–B M.R.S.A. § 3863 constituted a "commitment" for purposes of conviction under 18 U.S.C. § 922(g)(4). The federal district court held that Chamberlain's five-day involuntary admission, which was followed by his continued admission on a voluntary basis, constituted a "commitment" for purposes of the federal firearms ban. Chamberlain contends that his five-day emergency detention under Maine law fell short of amounting to a "commitment," and that only detention under an involuntary commitment order obtained pursuant to section 3864, note 3, *supra*, would have constituted a "commitment" allowing conviction under the federal firearms statute. We review *de novo* the district court's interpretation of the term "commitment." *See United States v. Ortiz*, 146 F.3d 25, 28 (1st Cir.1998).

We begin with the language of 18 U.S.C. § 922(g)(4), part of the federal Gun Control Act of 1968. Section 922(g)(4) states that it shall be unlawful for anyone

(4) who has been adjudicated as a mental defective or who has been committed to a mental institution;

. . .

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

The Gun Control Act does not define the phrase "committed to a mental institution." *See* 18 U.S.C. §§ 921, 922; *see also United States v. Waters*, 23 F.3d 29, 31 (2d Cir.1994), *cert. denied*, 513 U.S. 867, 115 S.Ct. 185, 130 L.Ed.2d 119 (1994).

■ Determination of whether Chamberlain was so "committed" is a question of federal law. *See Waters*, 23 F.3d at 31; *United States v. Giardina*, 861 F.2d 1334, 1335 (5th Cir.1988). *Cf. Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 111–12, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983) ("Whether one has been 'convicted' within the language of the gun control statutes is . . . a question of federal . . . law, despite the fact that the predicate offense and its punishment are defined by the law of the State.") (citation omitted). While we are determining a question of federal law, we "may seek guidance from state law," *Giardina*, 861 F.2d at 1335, since "commitment" occurs pursuant to procedures required by state law. *See United States v. Hansel*, 474 F.2d 1120, 1122–23 (8th Cir.1973). After taking into account whatever guidance state law may offer, our interpretation must in any case be consistent with federal policy. *See Waters*, 23 F.3d at 31; *Giardina*, 861 F.2d at 1335. Accordingly, we examine both Maine's statutory involuntary hospitalization procedures and the federal gun control policy embodied in § 922(g)(4).

A. *Maine's Involuntary Hospitalization Law*

Under Maine law, a person may be "admitted to a mental hospital, on an emergency

basis," upon written application stating the applicant's belief that the person is mentally ill and, because of his illness, "poses a likelihood of serious harm." 34–B M.R.S.A. § 3863(1). The Maine statute elsewhere describes such an emergency admission as an "involuntary admission" and it is clear that a person so admitted cannot leave the institution and is under its control.[4] The application must be accompanied by a certificate signed by a health care professional who has examined the patient not more than three days before the date of admission and determined that the patient "poses a likelihood of serious harm." *Id.*, § 3863(2).

The application and the accompanying certificate must be reviewed by a Justice of the Superior Court, Judge of the District Court, Judge of Probate or a justice of the peace. *See id.*, § 3863(3). If the judicial officer determines that the application and certificate are "regular and in accordance with the law," *id.*, the statute requires that he or she endorse them. A patient admitted on an emergency basis may not be detained for more than five days. *See id.*, § 3863(5)(B)(2).

Once a patient is involuntarily admitted, section 3863 requires that the patient be examined "as soon as practicable." *See id.*, § 3863(7). If this post-admission examination is not held within twenty-four hours after the time of admission, or if a health care provider fails or refuses after the examination to certify that the patient is mentally ill and, due to his mental illness, "poses a likelihood of serious harm," the patient must be immediately discharged. *See id.*, § 3863(7)(C).

After the initial five-day involuntary hospitalization, a patient may elect to be "informally admitted" for a longer period, provided the chief administrative officer of the hospital determines that admission of the patient on an informal basis is appropriate. *See id.*, § 3863(5)(A). This informal, voluntary admission may be indefinite. If the patient does not choose to be informally admitted, or the chief administrative officer determines that admission of the patient on an informal basis is not appropriate, and the chief administrative officer believes that further hospitalization is warranted, the chief administrative officer "may seek involuntary commitment" of the patient. *See id.*, § 3863(5)(B).

To secure a further judicial "involuntary commitment" at this later stage, the chief administrative officer must file "[a]n application to the District Court to admit a person to a mental hospital." *See id.*, § 3864(1).[5] The patient is entitled to notice of the proceedings and of his or her right to retain counsel. *Id.*, § 3864(4). If neither the patient nor anyone else provides counsel, the statute requires that the court appoint counsel for the patient. *Id.*, § 3864(5)(D). The patient must be examined by two examiners, each of whom must be a licensed physician or a licensed clinical psychologist. *Id.*[6] One of the examiners must be a physician or psychologist chosen by the patient or the patient's counsel. *Id.* If the report of the examiners is to the effect that the person is mentally ill or poses a likelihood of serious harm, the patient is entitled to a hearing before the district court, at which the patient, the applicant, and others are afforded an opportunity to appear and testify. *Id.*, § 3864(5)(C). At the hearing, the court "shall receive all relevant and material evidence which may be offered in accordance with accepted rules of evidence and accepted judicial dispositions." *Id.*

To issue a commitment order at this stage, the district court must find, by clear and convincing evidence, that the person is "mentally ill" and "poses a likelihood of serious harm." *Id.*, § 3864(6)(A)(1). The court must also find that inpatient hospitalization is the best available means for treatment and that the proposed individual treatment plan is satisfactory. *Id.*, §§ 3864(6)(A)(2)-(3). Upon

---

4. *See, e.g.,* 34–B M.R.S.A. § 3863(3)(B)(2) ("For a person sought to be involuntarily admitted under this section . . ."). The relevant text is comprehensively reproduced in the Appendix.

5. *See* the attached Appendix.

6. These examiners must be health care providers other than the person who signed the certification in support of the patient's "emergency" admission pursuant to section 3863. *See* 34–B M.R.S.A. § 3864(4)(A)(3).

making these findings, the court may order the patient committed for a period not to exceed four months in the first instance and not to exceed one year after the first and all subsequent hearings. *Id.*, § 3864(7).

## B. *Federal Policy Relating to the Possession of Firearms*

Congress' intent in enacting 18 U.S.C. § 922 was "to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." *Dickerson,* 460 U.S. at 112, 103 S.Ct. 986 (quoting *Lewis v. United States,* 445 U.S. 55, 63, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980)). In *Huddleston v. United States,* 415 U.S. 814, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974), the Supreme Court stated:

> The principal purpose of the federal gun control legislation ... was to curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'

415 U.S. at 824, 94 S.Ct. 1262 (citation omitted).

According to the Supreme Court, Congress in enacting the firearms ban "sought to rule broadly." *Dickerson,* 460 U.S. at 112, 103 S.Ct. 986 (quoting *Scarborough v. United States,* 431 U.S. 563, 572, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977)). *See also id.* at 116, 103 S.Ct. 986 ("Congress was reaching far and was doing so intentionally."); *Huddleston,* 415 U.S. at 824, 94 S.Ct. 1262(stating Congress was concerned with general availability of firearms "to those whose possession thereof was contrary to the public interest"). Consistent with this broad purpose, Congress did not limit the firearms prohibition only to those who had already committed dangerous or violent acts. *See, e.g.,* 18 U.S.C. § 922(n) (prohibiting possession of firearms by any person under indictment for crime punishable by imprisonment for a term exceeding one year, whether crime was violent or not);

*id.,* § 922(g)(1) (prohibiting possession of firearms by felons, whether or not convicted of a crime of violence). *See also* 18 U.S.C. § 922(g)(3)(prohibiting possession of firearms by unlawful users of controlled substances); *id.,* § 922(g)(5) (illegal aliens); *id.,* § 922(g)(7)(citizens who have renounced their citizenship).

The legislative history indicates that Congress intended to apply the prohibition against the possession or ownership of firearms by "mentally unstable" or "irresponsible" individuals. *See* H.R. 17735, 90th Cong., 2d Sess. (1968), 114 Cong. Rec. 21780, 21791, 21832, and 22270 (1968). Congress considered the mere risk or potential for violence or irresponsible use sufficient reason to prohibit certain categories of persons from possessing firearms. *See Dickerson,* 460 U.S. at 112 n. 6, 103 S.Ct. 986 ("Congress' intent in enacting § 922(g) ... was to keep firearms out of the hands of presumptively risky people."); *Barrett v. United States,* 423 U.S. 212, 220, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976) (legislative history reflects a concern with "keeping firearms out of the hands of categories of potentially irresponsible persons"). As for an individual adjudicated a mental defective or committed to a mental institution, "Congress obviously felt that such a person, though unfortunate, was too much of a risk to be allowed firearms privileges." *Dickerson,* 460 U.S. at 116, 103 S.Ct. 986.

In enacting the federal firearms ban, Congress had a second purpose in mind—national uniformity in determinations of whether a person is within a category covered by the firearms prohibition. As the Supreme Court has stated, treating the scope of the ban as a matter of federal law "makes for desirable national uniformity unaffected by varying state laws, procedures, and definitions ..." *Dickerson,* 460 U.S. at 112, 103 S.Ct. 986. The *Dickerson* Court noted that giving effect to the intricacies of varying state statutes would "seriously hamper effective enforcement of [the firearms ban]." *Id.* at 121, 103 S.Ct. 986.[7]

---

7. In *Dickerson,* the Court held that expunction of a conviction pursuant to state law did not nullify a conviction for purposes of the federal firearms ban. 460 U.S. at 114–15, 103 S.Ct. 986. Three years later, Congress amended Chapter 44 of

Title 18. *See* Pub.L. No. 99–308, 100 Stat. 449 (1986). Among the amendments was a revision of § 921(a)(20), by which Congress required that "conviction" be defined under the law of the jurisdiction in which the defendant was convict-

### C. "Commitment" Pursuant to 18 U.S.C. § 922(g)(4)

■ Chamberlain does not deny that Maine's procedural requirements for an emergency involuntary hospitalization pursuant to 34–B M.R.S.A. § 3863 were met in his case. He contends, however, that his preliminary five-day involuntary hospitalization, which was followed by his voluntary admission to the same institution on an informal basis for an additional eight days, did not amount to a "commitment" sufficient for conviction under 18 U.S.C. § 922(g)(4). He argues that a person can be deemed "committed" under Maine law for purposes of the federal firearms ban only after notice and issuance by a state judge of a formal order of commitment following a full hearing at which the person has had the opportunity to be heard.

■ As said, Congress itself has not defined the term "commitment." However, in ordinary usage, "commitment" means "to place in or send officially to confinement ... to consign legally to a mental institution...." *See* Webster's Third New International Dictionary (1971). In that sense, Chamberlain's "involuntary admission" under section 3863 would seem no different from a "commitment." In urging us to interpret "commitment" so as to exclude an initial five-day emergency detention, Chamberlain relies upon the maxim that an "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971); *United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). The rule of lenity serves important goals, including allowing fair warning as to what conduct is criminal and punishable, and is "the product of an awareness that

legislators and not the courts should define criminal activity." *Huddleston*, 415 U.S. at 814, 94 S.Ct. 1262. As the *Huddleston* Court noted, however, "[z]eal in forwarding these laudable policies ... must not be permitted to shadow the understanding that '[s]ound rules of statutory interpretation exist to discover and not to direct the Congressional will.'" *Id.* (quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 542, 63 S.Ct. 379, 87 L.Ed. 443 (1943)). "Although penal laws are to be construed strictly, they 'ought not to be construed so strictly as to defeat the obvious intention of the legislature.'" *Huddleston*, 415 U.S. at 814, 94 S.Ct. 1262 (quoting *American Fur Co. v. United States*, 27 U.S. 358, 2 Pet. 358, 367, 7 L.Ed. 450 (1829)). We believe that Congress's intent can reasonably be ascertained in this case and that Chamberlain's restrictive interpretation of "commitment" would defeat the "broad prophylactic purpose," *Dickerson*, 460 U.S. at 118, 103 S.Ct. 986, of the federal firearms ban.

Chamberlain focuses first on the fact that section 3863 of the Maine statute uses only the phrase "involuntary admission" with respect to the five-day emergency detention in issue, whereas section 3864 speaks expressly of "commitment" in regard to the longer-term detention discussed there. He argues that we owe this difference in terminology "great deference." We find no evidence, however, that the Maine Legislature consciously used the "involuntary admission" language to distinguish between that and a "commitment." To the contrary, the legislature has used the terms "admission" and "commitment" interchangeably. Section 3864(1)refers to the post-emergency application filed by the chief administrative officer of the hospital under § 3863(5)(B) [8]—filed

---

ed and providing that a conviction which has been expunged is not a "conviction" for purposes of the firearms ban. As we have noted, however, "[t]hat congressional action ... reflects not a disagreement with the Court's reasoning, but merely that Congress determined that its legislative objectives would be better served by defining 'conviction' by reference to state law." *United States v. Cuevas*, 75 F.3d 778, 782 (1st Cir.1996). *See also Yanez–Popp v. INS*, 998 F.2d 231, 236 (4th Cir.1993)("[*Dickerson*] still stands for the general proposition that federal law governs the

application of Congressional statutes in the absence of plain language to the contrary."). Congress' decision to overrule the particular result reached in *Dickerson* reflects a "deliberate choice," *Cuevas*, 75 F.3d at 782, to define "conviction" by reference to state law. Congress has not made the same choice with respect to the term "commitment."

8. As noted *supra*, Section 3863(5)(B) outlines the procedure whereby a chief administrative officer may seek the continued detention of a patient

pursuant to a procedure Chamberlain urges us to interpret as a "commitment"—as an application "to admit" a person to a mental hospital.[9] This legislative imprecision undermines Chamberlain's attempt to find an important meaning in the difference in terminology here. Chamberlain's argument likewise finds no support in the opinions of the Maine courts concerning the involuntary hospitalization statutes and their predecessors. The Maine Supreme Court has at times characterized the initial involuntary hospitalization under § 3863 as a "commitment," *see, e.g.,In re Faucher,* 558 A.2d 705, 706 (Me.1989), and at other times has characterized the same procedure as one for "emergency admittance," *Sukeforth v. Thegen,* 256 A.2d 162 (Me.1969).[10]

Moreover, even if the Maine Legislature had been more precise in its use of the two terms, we would be faced with the question of how far to rely upon the language chosen by the state legislature in interpreting "commitment" for purposes of the federal firearms ban. We would hesitate to convert a question of federal law into one solely of state law, as such an approach could destroy the uniformity Congress sought in enacting section 922(g)(4). State statutes tend to vary widely as to the language chosen to describe the process of involuntary hospitalization. *Compare, e.g.,* Massachusetts General Laws, chapter 123, § 12(e)(referring to a ten-day emergency involuntary hospitalization, similar to section 3863's five-day detention, as a "commitment") *with* 34–B M.R.S.A. § 3863(1)(characterizing emergency procedure as "admission"). Were we to focus

solely on whether or not the term "commitment" is used, a patient in Massachusetts admitted on an emergency basis would be deemed "committed" for purposes of conviction under the federal firearms ban, while a patient involuntarily hospitalized in Maine in identical circumstances would not. This is precisely the sort of "national patchwork," *Dickerson,* 460 U.S. at 122, 103 S.Ct. 986, Congress sought to avoid in enacting the firearms ban.

In support of his narrow interpretation of "commitment," Chamberlain relies primarily upon *Giardina* and *Hansel.* In those cases, the courts indeed relied upon the words chosen by the respective state legislatures in concluding that no "commitment" had occurred. In *Giardina,* petitioner was involuntarily hospitalized for two weeks pursuant to a Louisiana statute allowing detention of persons based upon a "Physician's Emergency Certificate" stating that the person is "mentally ill." The Eighth Circuit carefully examined the language used by the Louisiana Legislature in both the then-existing and superseded versions of the involuntary hospitalization statutes, and concluded that since no "commitment"—as the process had been characterized by the state legislature—had occurred, no "commitment" had taken place for purposes of the federal firearms ban. 861 F.2d at 1336. In *Hansel,* the Fifth Circuit followed a similar course. The court concluded that since the Texas statute at issue did not characterize Hansel's involuntary detention as a "commitment," no "commitment" had occurred pursuant to 18 U.S.C. § 922. 474 F.2d at 1122–23.[11]

beyond the initial five-day emergency period, in cases in which the patient is not admitted informally on a voluntary basis.

**9.** Section 3864(1) states, in relevant part: "An application to the District Court *to admit* a person to a mental hospital, filed under section 3863, subsection 5, paragraph B, shall be accompanied by ..." (emphasis supplied).

**10.** If the terminology points in any direction, it would be in favor of a conclusion that the emergency procedure with which we are concerned is a commitment. The district court focused in part on the dictionary definitions of "admit" and "commit." It noted that "admission" implies a voluntary or permissive entry, whereas "commitment" denotes involuntary action of some kind.

Section 3863 specifically speaks of *"involuntary admission"* in several places. The district court reasoned that it makes little sense to speak of an "involuntary admission" as a voluntary act. Like the district court, we see little practical difference between a "commitment" and an "involuntary admission." A person involuntarily admitted under section 3863 is in the same posture as if he were committed pursuant to a formal court order following a hearing—he is not free to leave the institution.

**11.** In *Hansel,* the defendant was found at the time of his admission to have no serious mental illness and was also found not to be in need of hospitalization. 474 F.2d at 1123. Thus, although we disagree with the approach taken by

With all respect, we believe that the proper interpretation of the phrase, "committed to a mental institution," should not turn primarily on the label attached by the state legislature to its procedures, but rather on the substance of those procedures. Thus, rather than focus on the nuances of state statutory language in interpreting "commitment," we look at the realities of the state procedures and construe them in light of the purposes Congress sought to accomplish by prohibiting firearm possession by someone who has been "committed to a mental institution." We ask whether identifying the state's procedures for involuntary hospitalization as a "commitment" is reasonable and consistent with the federal policy underlying the firearms ban—namely, to keep firearms out of the hands of those who, if permitted to possess them, would pose a risk or potential for harm. *See Waters,* 23 F.3d at 34.

For this reason, we respectfully decline to follow the approach of *Giardina* and *Hansel,* the cases on which Chamberlain primarily relies. Our approach is similar to the analysis of the Second Circuit in *Waters.* In *Waters,* petitioner was involuntarily hospitalized pursuant to a New York statute similar in many respects to the Maine statute under consideration. The statute allowed for the "involuntary admission" of an individual for sixty days based upon an application of a relative or other qualified person and a certificate, signed by two physicians, showing that the physicians had examined the individual within ten days of admission and determined that he was "mentally ill." *Id.,* at 32. The statute provided that during the sixty-day period, the individual may request a hearing on the question of the need for involuntary treatment. *Id.* at 30. At the end of the sixty days, the patient could be further detained if he voluntarily admitted himself for an additional period or the director of the mental health facility obtained a court order authorizing the person's "continued detention." *Id.* At the end of the initial sixty-day period, Waters voluntarily admitted himself for an additional seven months. No formal

court order of "continued detention" was ever obtained.

The Second Circuit held that these procedures, "whether termed an 'admission' or a 'commitment' [by the legislature] . . . established 'commitment' procedures under New York state law, and Waters was 'committed' pursuant to those procedures." *Id.* at 34. The court noted that no formal judicial proceeding was required under the state statute to detain a person beyond the initial sixty days—a person could voluntarily admit himself to the institution for an indefinite period. *Id.* at 34. The court went on to conclude that deeming the procedures at issue a "commitment" was consistent with federal gun control policy, which seeks to prohibit the possession of firearms by "those with a potential for violence." *Id.* at 34–35.

The procedures followed in this case, whether denominated as an "involuntary admission" or a "commitment" by the Maine Legislature, constituted in all functional respects a "commitment" for purposes of § 922(g)(4). Chamberlain was involuntarily hospitalized based upon an application filed by a clinician at a mental hospital who stated that Chamberlain had put a loaded gun to his head and threatened his wife. Prior to admission, Chamberlain was examined by a physician who certified, as required under Maine law in order to detain Chamberlain involuntarily, that Chamberlain suffered from a mental illness and posed a danger to himself and others. A judicial officer reviewed the application and the certification of the first physician, determined that they were prepared in accordance with law, and ordered that Chamberlain be detained in a mental institution for five days. A second physician examined Chamberlain within twenty-four hours of admission and certified that Chamberlain suffered from a mental illness and posed a danger to himself and others. During the five-day emergency detention, Chamberlain was not free to go as he pleased. In all respects, then, we conclude that Chamberlain was formally "committed" to a mental institution. *See* H.R.Rep. No.

the Eighth Circuit, the court's conclusion that no "commitment" had occurred seems consistent with federal policy. According to hospital personnel, Hansel posed no risk or potential for harm due to mental illness or instability.

1577, 90th Cong., 2d Sess.(1968), *reprinted in* 1968 U.S.C.C.A.N. 4410, 4421 (noting that it would be unlawful to possess a firearm under the statute if one has been formally committed, for example, pursuant to court order).

We reject Chamberlain's argument that a person is not "committed" for purposes of the federal firearms ban unless all of the requirements set forth in section 3864—including provision of counsel, a full-blown adversary hearing, a finding by clear and convincing evidence that the person suffers from a mental illness, and a judicial order of commitment—are satisfied. Persons held under section 3863 are involuntarily detained as surely as are those held for longer periods under the more elaborate procedures of section 3864. Moreover, to treat section 3864 detention as the only "real" commitment would come close to limiting "commitments" to cases in which a person has actually been "adjudicated a mental defective" after an adversary hearing. 18 U.S.C. § 922(g)(4) separately bans persons who have been "adjudicated a mental defective" from owning firearms, in addition to those who have been "committed to a mental institution." In denying firearms to those "committed to a mental institution," Congress appears to have cast a wider net— to "maximize the possibility of keeping firearms out of the hands of [, among others, persons suffering from mental illness]." *See* 114 Cong. Rec. 21784 (1968) (remarks of Congressman Celler). Requiring an adversary hearing and a judicial finding of mental illness would conflate two of the categories Congress singled out for the firearms prohibition.

We repeat that Congress deemed the *potential* for misuse of firearms or violence sufficient to bring various categories of individuals within the firearms ban. The legislative history nowhere suggests the need for showing "clear and convincing evidence" of dangerousness with regard to other categories of individuals placed within the firearms ban—including those under indictment, convicted felons, drug abusers, illegal aliens, and those who have renounced their citizenship. To require a full-scale adversary proceeding and a finding, by clear and convincing evidence, that a person is mentally ill and poses a likelihood of harm to himself or others before giving effect to the firearms ban would undermine Congress's judgment that risk or potential, not likelihood, probability, or certainty, of violence is all that is required.

Nor does it appear that Congress intended that only persons conclusively found to be suffering from mental illnesses or difficulties after having been afforded the fullest possible panoply of due process rights be deemed to have been "committed to a mental institution" for purposes of the firearms ban.[12] That level of formality is not required for most of the categories Congress identified as within the firearms ban, including those who have merely been indicted for a crime. *See* 18 U.S.C. § 922(n). When Congress has intended that a particular status triggering the firearms ban be conditioned upon notice and the opportunity to be heard, along with other procedural rights, it has stated so explicitly. In 1994, for example, Congress amended the Gun Control Act to include within the firearms prohibition persons

> subject to a court order that ... restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or

---

**12.** Although he mounts no challenge to the constitutionality of Maine's involuntary commitment procedures, Chamberlain argues that since he, unlike Waters, was not able to secure a hearing to challenge his hospitalization during the five-day emergency detention period, he cannot be deemed to have been "committed" for purposes of § 922(g)(4). But while it is true that New York law, which allows emergency detentions for up to sixty days, provides for the right to request a hearing, Maine's law, which provides for a

much shorter emergency detention, requires automatic judicial involvement in the process of involuntary hospitalization. It also provides for examination and certification by two medical professionals. In the instant case, moreover, Chamberlain voluntarily prolonged his own hospitalization following the five-day involuntary admission. He did not claim then, nor does he now contend, that the stated grounds for his commitment were invalid.

person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child . . .

18 U.S.C. § 922(g)(8), Pub.L. 103–322, § 110401(c). Before the ban can be applied against such persons, however, Congress required that several procedural rights be provided, including a hearing at which the person has the opportunity to participate and a judicial finding that such person "represents a credible threat to the physical safety of such intimate partner or child." *See* §§ 922(g)(8)(A),(C). *See also* 18 U.S.C. § 922(g)(1) (imposing the ban against those convicted of felony). Congress imposed no such procedural requirements with respect to determining those "committed to a mental institution."

A further reason to find that the meaning Congress envisioned for commitment encompasses Maine's five-day involuntary admission procedure is that many patients of the type Congress would not want to possess firearms may have undergone, like Chamberlain, the five-day emergency detention under section 3863 followed by a voluntary stay at the institution, rather than followed by a further involuntary detention there under section 3864. The initial five-day commitment requires, in both situations, medical findings of dangerousness, although Chamberlain's treatment at Acadia Hospital was thereafter prolonged beyond the five days on a voluntary basis, permitting his continued treatment without need for officials to request his additional involuntary commitment. Were we to hold that the initial emergency commitment was an insufficient basis for bringing him under the federal weapons ban, Chamberlain and many like him would be exempted from the ban even though, in many instances, their mental condition and potential for dangerousness might have been no different from those whose additional hospitalization was under section 3864 rather than being voluntary.

While we conclude, therefore, that a five-day emergency detention is a "commitment", and that it implicates the potential for harm Congress sought to regulate under the fire-arms ban, we realize the possibility of instances in which an initial commitment of this type may later be shown, in further state proceedings, to have been mistaken. This, however, is not such a case, hence we need not decide to what extent subsequent proceedings before state tribunals may vitiate a five-day emergency detention for purposes of section 922(g)(4). Here, Chamberlain voluntarily elected to remain at Acadia for more than a week after the initial five-day admission period expired. He does not contest the validity of his emergency admission, but only whether that admission constitutes a legally sufficient "commitment."

We also note that Chamberlain and others similarly situated are provided by Congress with the administrative means to contest and, in appropriate circumstances, to remove the firearms ban Congress has imposed against those committed to a mental institution. *Department of Treasury v. Galioto*, 477 U.S. 556, 559, 106 S.Ct. 2683, 91 L.Ed.2d 459 (1986). *See also Waters*, 23 F.3d at 35. Under 18 U.S.C. § 925(c), such persons may apply to the Secretary of the Treasury for relief from the firearms ban. The Secretary may grant relief

> if it is established to his satisfaction that the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest.

18 U.S.C. § 925(c). *See* 27 C.F.R. § 178.144 (describing procedures by which one may petition for relief). These procedures allow a formerly committed person to challenge the continuing validity of a determination that he suffers from a mental illness and is a danger to himself or others. Although he could have done so, Chamberlain did not avail himself of this administrative remedy.

We conclude that, under the circumstances presented here, Chamberlain was "committed" to a mental institution for purposes of conviction under 18 U.S.C. § 922(g)(4).

*Affirmed.*

*APPENDIX*

*34–B M.R.S.A. § 3863*

### § 3863   Emergency procedure

A person may be admitted to a mental hospital on an emergency basis according to the following procedures.

1. **Application.** Any health officer, law enforcement officer or other person may make a written application to admit a person to a mental hospital ... stating:

A. His belief that the person is mentally ill and, because of his illness, poses a likelihood of serious harm; and

B. The grounds for this belief.

2. **Certifying Examination.** The written application shall be accompanied by a dated certificate, signed by a licensed physician or a licensed clinical psychologist, stating:

A. The licensed physician or licensed clinical psychologist has examined the person on the date of the certificate; and

B. He is of the opinion that the person is mentally ill and, because of his illness, poses a likelihood of serious harm.

\* \* \* \* \* \*

3. **Judicial Review.** The application and accompanying certificate must be reviewed by a Justice of the Superior Court, Judge of the District Court, Judge of Probate or a justice of the peace.

A. If the judge or justice finds the application and accompanying certificate to be regular and in accordance with the law, the judge or justice shall endorse them.

B. A person may not be held against the person's will in the hospital under this section, whether informally admitted under section 3831 or sought to be involuntarily admitted under this section, unless the application and certificate have been endorsed by a judge or justice, except that a person for whom an examiner has executed the certificate under subsection 2 may be detained in a hospital for a reasonable period of time, not to exceed 18 hours, pending endorsement by a judge or justice, if:

(1) For a person informally admitted under section 3831, the chief administrative officer of the hospital undertakes to secure the endorsement immediately upon execution of the certificate by the examiner; and

(2) For a person sought to be involuntarily admitted under this section, the person or persons transporting the person sought to be involuntarily admitted to the hospital undertake to secure the endorsement immediately upon execution of the certificate by the examiner.

C. Notwithstanding paragraph B, subparagraphs (1) and (2), a person sought to be admitted informally under section 3831 or involuntarily under this section may be transported to a hospital and held for evaluation and treatment at a hospital pending judicial endorsement of the application and certificate if the endorsement is obtained between the soonest available hours of 7:00 a.m. and 11:00 p.m.

\* \* \* \* \* \*

5. **Continuation of hospitalization.** If the chief administrative officer of the hospital recommends further hospitalization of the person, the chief administrative officer shall determine the suitability of admission, care and treatment of the patient as an informally admitted patient, as described in section 3831.

A. If the chief administrative officer of the hospital determines that admission of the person as an informally admitted patient is suitable, the chief administrative officer shall admit the person on this basis, if the person so desires.

B. If the chief administrative officer of the hospital determines that admission of the person as an informally admitted patient is not suitable, or if the person declines admission as an informally admitted patient, the chief administrative officer of the hospital may seek involuntary commitment of the patient by filing an application for the issuance of an order for hospitalization under section 3864, except that if the hospital is a designated nonstate mental health institution and if the patient was admitted under the contract between the hospital and the department for receipt by the hospital of involuntary patients, then the chief administrative officer may seek involuntary commitment only by

requesting the commissioner to file an application for the issuance of an order for hospitalization under section 3864.

(1) The application must be made to the District Court having territorial jurisdiction over the hospital to which the person was admitted on an emergency basis.

(2) The application must be filed within 5 days from the admission of the patient under this section, excluding the day of admission and any Saturday, Sunday or legal holiday.

C. If neither readmission nor application to the District Court is effected under this subsection, the chief administrative officer of the hospital to which the person was admitted on an emergency basis shall discharge the person immediately.

6. **Notice.** Upon admission of a person under this section, and after consultation with the person, the chief administrative officer of the hospital shall notify, as soon as possible regarding the fact of admission, the person's:

    A. Guardian, if known;

    B. Spouse;

    C. Parent;

    D. Adult child; or

    E. One of next of kin or a friend, if none of the other persons exist.

If the chief administrative officer has reason to believe that notice to any individual in paragraphs A to E would pose risk of harm to the person admitted, then notice may not be given to that individual.

7. **Post-admission examination.** Every patient admitted to a hospital shall be examined as soon as practicable after his admission.

    A. The chief administrative officer of the hospital shall arrange for examination by a staff physician or licensed clinical psychologist of every patient hospitalized under this section.

    B. The examiner may not be the certifying examiner under this section or under section 3864.

    C. If the post-admission examination is not held within 24 hours after the time of admission, or if a staff physician or licensed clinical psychologist fails or refuses after the examination to certify that, in his opinion, the person is mentally ill and due to his mental illness poses a likelihood of serious harm, the person shall be immediately discharged.

\* \* \* \* \* \*

*34–B M.R.S.A. § 3864*

§ 3864 Judicial procedure and commitment

1. **Application.** An application to the District Court to admit a person to a mental hospital, filed under section 3863, subsection 5, paragraph B, shall be accompanied by:

    A. The emergency application under section 3863, subsection 1;

    B. The accompanying certificate of the physician or psychologist under section 3863, subsection 2;

    C. The certificate of the physician or psychologist under section 3863, subsection 7 that:

    (1) The physician or psychologist has examined the patient; and

    (2) It is the opinion of the physician or psychologist that the patient is a mentally ill person and, because of that patient's illness, poses a likelihood of serious harm;

    D. A written statement, signed by the chief administrative officer of the hospital, certifying that a copy of the application and the accompanying documents have been given personally to the patient and that the patient and the patient's guardian or next of kin have been notified of the patient's right to retain an attorney or to have an attorney appointed, of the patient's right to select or to have the patient's attorney select an independent examiner and regarding instructions on how to contact the District Court; and

    E. A copy of the notice and instructions given to the patient.

2. **Detention pending judicial determination.** Notwithstanding any other provisions of this subchapter, a person, with respect to whom an application for the issuance of an order of hospitalization has been filed,,

may not be released or discharged during the pendency of proceedings, unless:

A. The District Court orders release or discharge upon the request of the patient, or the patient's guardian, parent, spouse or next of kin;

B. The District Court orders release or discharge upon the report of the applicant that the person may be discharged with safety;

C. A court orders release or discharge upon a writ of habeas corpus under section 3804; or

D. Upon request of the commissioner, the District Court orders the transfer of a patient in need of more specialized treatment to another hospital. In the event of a transfer, the court shall transfer its file to the District Court having territorial jurisdiction over the receiving hospital.

**3. Notice of receipt of application.** The giving of notice of receipt of application and date of hearing under this section is governed as follows.

A. Upon receipt by the District Court of the application and accompanying documents specified in subsection 1, the court shall cause written notice of the application and date of hearing:

(1) To be mailed within 2 days of filing to the person; and

(2) To be mailed to the person's guardian, if known, and to the person's spouse, parent or one of the person's adult children, if none of these persons exist or if none of those persons can be located, to one of the person's next of kin or a friend, except that if the chief administrative officer has reason to believe that notice to any of these individuals would pose risk of harm to the person who is the subject of the application, notice to that individual may not be given.

B. A docket entry is sufficient evidence that notice under this subsection has been given.

**4. Examination.** Examinations under this section are governed as follows.

A. Upon receipt by the District Court of the application and the accompanying documents specified in subsection 1 and at least 3 days after the person who is the subject of the examination was notified by the hospital of the proceedings and of that person's right to retain counsel or to select an examiner, the court shall cause the person to be examined by 2 examiners.

(1) Each examiner must be either a licensed physician or a licensed clinical psychologist.

(2) One of the examiners must be a physician or psychologist chosen by the person or by that person's counsel, if the chosen physician or psychologist is reasonably available.

(3) Neither examiner appointed by the court may be the certifying examiner under section 3863, subsection 2 or 7.

B. The examination shall be held at the hospital or at any other suitable place not likely to have a harmful effect on the mental health of the person.

C. If the report of the examiners is to the effect that the person is not mentally ill or does not pose a likelihood of serious harm, the application shall be ordered discharged forthwith.

D. If the report of the examiners is to the effect that the person is mentally ill or poses a likelihood of serious harm, the hearing shall be held on the date, or on the continued date, which the court has set for the hearing.

**5. Hearing.** Hearings under this section are governed as follows.

A. The District Court shall hold a hearing on the application not later than 15 days from the date of the application.

(1) On a motion by any party, the hearing may be continued for cause for a period not to exceed 10 additional days.

(2) If the hearing is not held within the time specified, or within the specified continuance period, the court shall dismiss the application and order the person discharged forthwith.

(3) In computing the time periods set forth in this paragraph, the District Court Civil Rules shall apply.

B. The hearing must be conducted in as informal a manner as may be consistent with orderly procedure and in a physical setting not likely to have harmful effect on the mental health of the person.

\* \* \* \* \* \*

C. The court shall receive all relevant and material evidence which may be offered in accordance with accepted rules of evidence and accepted judicial dispositions.

(1) The person, the applicant and all other persons to whom notice is required to be sent shall be afforded an opportunity to appear at the hearing to testify and to present and cross-examine witnesses.

(2) The court may, in its discretion, receive the testimony of any other person and may subpoena any witness.

D. The person shall be afforded an opportunity to be represented by counsel, and, if neither the person nor others provide counsel, the court shall appoint counsel for the person.

E. In addition to proving that the patient is a mentally ill individual, the applicant shall show:

(1) By evidence of the patient's actions and behavior, that the patient poses a likelihood of serious harm; and

(2) That, after full consideration of less restrictive treatment settings and modalities, inpatient hospitalization is the best available means for the treatment of the person.

F. In each case, the applicant shall submit to the court, at the time of the hearing, testimony, including expert psychiatric testimony, indicating the individual treatment plan to be followed by the hospital staff, if the person is committed under this section, and shall bear any expense for witnesses for this purpose.

\* \* \* \* \* \*

6. **Court findings.** Procedures dealing with the District Court's findings under this section are as follows.

A. The District Court shall so state in the record, if it finds upon completion of the hearing and consideration of the record:

(1) Clear and convincing evidence that the person is mentally ill and that the person's recent actions and behavior demonstrate that the person's illness poses a likelihood of serious harm;

(2) That inpatient hospitalization is the best available means for treatment of the patient; and

(3) That it is satisfied with the individual treatment plan offered by the hospital to which the applicant seeks the patient's involuntary commitment.

\* \* \* \* \* \*

7. **Commitment.** Upon making the findings described in subsection 6, the court may order a commitment to a hospital for a period not to exceed 4 months in the first instance and not to exceed one year after the first and all subsequent hearings.

A. The court may issue an order of commitment immediately after the completion of the hearing, or it may take the matter under advisement and issue an order within 24 hours of the hearing.

B. If the court does not issue an order of commitment within 24 hours of the completion of the hearing, it shall dismiss the application and order the patient discharged immediately.

8. **Continued involuntary hospitalization.** If the chief administrative officer of the hospital to which a person has been committed involuntarily by the District Court recommends that continued involuntary hospitalization is necessary for that person, the chief administrative officer shall notify the commissioner. The commissioner may then, not later than 30 days prior to the expiration of a period of commitment ordered by the court, make application in accordance with this section to the District Court that has territorial jurisdiction over the hospital designated for treatment in the application by the commissioner for a hearing to be held under this section.

* * * * * *

11. **Appeals.** A person ordered by the District Court to be committed to a hospital may appeal from that order to the Superior Court.

A. The appeal is on questions of law only.

B. Any findings of fact of the District Court may not be set aside unless clearly erroneous.

C. The order of the District Court shall remain in effect pending the appeal.

D. The District Court Civil Rules and the Maine Rules of Civil Procedure apply to the conduct of the appeals, except as otherwise specified in this subsection.