(135 P.3d 174)
No. 94,583

THE ESTATE OF JOSHUA C. PEMBERTON, and JAY PEMBERTON and SUSAN PEMBERTON, *Appellants,* v. JOHN'S SPORTS CENTER, INC., *Appellee.*

Opinion filed June 2, 2006.

*Toby Egan* and *Patrick M. Cuezze*, of Egan and Cuezze L.L.C., of Kansas City, Missouri, for appellants.

*Steve R. Fabert* and *Larry G. Pepperdine*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, for appellee.

Before GREEN, P.J., MALONE and BUSER, JJ.

GREEN, J.: The decedent, Joshua C. Pemberton (Josh), shot and killed himself with a shotgun purchased from John's Sports Center, Inc. (JSC). Josh's parents, Jay and Susan Pemberton, both as personal representatives of Josh's estate and in their own capacity (collectively, the Pembertons) sued JSC. JSC moved for summary judgment, which the trial court granted. On appeal, the Pembertons contend that the trial court erred in determining that 18 U.S.C. § 922(d) (2000), the federal firearms statute, had not been violated by JSC and that the evidence was sufficient to establish that JSC had negligently entrusted a shotgun to the decedent. We disagree and affirm the judgment of the trial court.

On July 15, 2002, Josh was found shot to death at about 1:30 p.m. in a parking lot in rural Crawford County, Kansas. Investigating officers concluded that Josh shot himself with a shotgun. Josh had purchased the shotgun from JSC shortly after 9 a.m. the day of his death. Josh was 22 years old.

After graduating from high school, Josh enrolled at Pittsburg State University. While in college, Josh worked as a counselor at Elm Acres, a center for teenagers with substance abuse problems.

On Monday, July 15, 2002, Josh was fired from his job at Elm Acres at approximately 8:15 a.m.

At approximately 9 a.m. that day, Josh entered JSC in Pittsburg. Two clerks were working at that time: Brant Duncan and Rod Pulliam. Neither Duncan nor Pulliam had ever met Josh before. Josh told Duncan that his friends wanted to take him hunting and that he wanted to buy a shotgun. Duncan showed Josh several different models, and Josh selected one to purchase.

Duncan provided Josh with the Federal Bureau of Alcohol, Tobacco, and Firearms (ATF) form 4473 to complete and watched Josh complete the form. Question 12(f) of the form asked: "Have you ever been adjudicated mentally defective (which includes have been adjudicated incompetent to manage your own affairs) or have you ever been committed to a mental institution?" Josh initially wrote "Yes" in response to this question. Question 13 of the form asked: "If you are a nonimmigrant alien, do you fall within any of the exceptions set forth in Important Notice 6, Exception 2?" Josh answered this question "No."

When Duncan reviewed the form, he noticed Josh's answers to questions 12(f) and 13. Duncan asked Josh if he understood question 12(f) and underlined the terms "committed" and "mental institution" on the form. Thereafter, Josh crossed out the word "Yes," wrote "No," and initialed his change. Josh also changed his answer to question 13 by crossing out the "No" and checking the box labeled "Not applicable."

After Josh completed the ATF form, Duncan called the NICS Division of the Federal Bureau of Investigation. NICS told Duncan that the sale could proceed. Pulliam then reviewed the form and approved it. The transaction was then completed, and Josh left with the shotgun.

Duncan testified in his deposition that he did not see any unusual behavior or nervousness on the part of Josh during the sale. Moreover, Duncan testified that he was comfortable with the transaction. Likewise, Pulliam testified in his deposition that he did not see Josh acting oddly while in the store.

After the transaction, however, Pulliam developed a "hunch" that Josh had "other motives" for buying the gun. According to

Pulliam, this hunch was not based upon Josh's behavior while in the store or anything Duncan said. Approximately 1 hour after the transaction, Pulliam called Josh and left a message stating that a discrepancy existed with the gun's serial number. Pulliam asked Josh to bring the gun back to the store so they could verify the gun's serial number. Pulliam admitted that there was no problem with the serial number. Josh called back and told Pulliam that he had a class to attend and that he would bring the gun back as soon as class was over. In the afternoon, Duncan called and left a message on Josh's answering machine because Josh had not returned to the store. Pulliam also called Josh later when Josh did not return to the store, and Pulliam left another message on the answering machine.

At approximately 1:30 p.m., the Crawford County Sheriff's Department received information that a body had been found in a car in a rural area near a restaurant. Josh was found in the driver's seat of the car holding the barrel of the shotgun in his right hand. A cord had been tied to the shotgun's trigger and then wrapped around the car's accelerator pedal. The officer opined that Josh had sat in the driver's seat, put the shotgun in his mouth, and stepped on the accelerator, causing the cord to pull the shotgun's trigger. There also was a bullet hole in the driver's seat of the car, about chest high, and the back window of the car was shattered. The officer opined that Josh had fired a test shot through the seat and out the back window before he shot himself. The coroner determined that Josh's blood alcohol concentration was .09. There were four suicide notes on the floor of the car.

Both the investigating officer and Josh's father, a physician, testified that Josh died instantly from the gunshot wound to his head.

Several days after Josh's death, Pulliam told an investigating police officer that at some point during the sale Josh was anxious or nervous. Pulliam described Josh's conduct as similar to someone who was late for work or for class. Pulliam also told the officer that he had tried to talk Josh into coming back into the store because Pulliam had a bad feeling. Pulliam told the officer that he simply wanted to get another look at Josh.

During discovery, it was disclosed that Josh had a long history of mental illness. Josh was diagnosed as having "extreme sibling rivalry" as a 4-year-old child. Josh's parents took him to a psychologist when he was in elementary school, and he was diagnosed with an "overanxious disorder." Josh was seen by the psychologist for 2 or 3 years.

When Josh was a freshman in high school, Josh's parents noticed that his behavior was sullen and depressive. They took Josh to see another psychologist. This psychologist treated Josh until sometime during his junior year in high school. During this time, Josh was prescribed antidepressants.

When Josh was a sophomore in high school, Josh's mother found Josh in the bathroom with a knife. Josh was making superficial cuts on his wrist with the knife. The Pembertons voluntarily admitted Josh to the Research Psychiatric Hospital in Kansas City, where he remained for 2 or 3 weeks. No court action was involved in this admission. Josh was diagnosed as depressed and bipolar.

Approximately 1 month after this incident, the Pembertons found Josh hallucinating. In addition, they found a suicide note he had written. The Pembertons again had Josh admitted to the Research Psychiatric Hospital. It was determined that Josh had overdosed on Benadryl, an over-the-counter medication. He was hospitalized for about 2 weeks. Thereafter, Josh continued to see a psychologist and participated in a voluntary outpatient program through the hospital.

Approximately 5 months after his discharge, Josh took approximately 100 Benadryl pills and then called his mother to say goodbye. Josh's parents called police, who located Josh unconscious in his car. After receiving medical treatment for the overdose, Josh was taken by his parents to Menninger's for a long-term treatment program. He remained at Menninger's for 3 months. Again, the Pembertons had Josh admitted voluntarily, thus avoiding a court proceeding to secure treatment for Josh. Josh finished his sophomore year of high school at Menninger's.

Halfway through his junior year of high school, Josh moved into an adult residential living center in Olathe and transferred to a high school there. The facility was for older teenagers who were

having mental problems. Josh returned home in January of his senior year in high school and finished high school.

Josh became depressed again during the fall of his freshman year at Pittsburg State. On October 7, 1998, he climbed to the top of a water tower in Pittsburg and threatened to jump. Police talked him down, took him into custody, and called his parents. The police gave Josh the option of going with his parents or being sent to Larned State Hospital. The Pembertons took him to the Research Psychiatric Hospital. Josh was 18 years old and consented to being admitted voluntarily there. There was no court order requiring his admission. Josh remained at the hospital for 1 or 2 weeks; he then returned to college.

Josh was seeing a psychologist at that time. Josh's sophomore and junior years at the university passed without incident. In February 2000, Josh began receiving treatment from Dr. Nauphyll Zuberi, a psychiatrist in Joplin, Missouri. Dr. Zuberi found that Josh suffered from a bipolar disorder and prescribed mood-stabilizing and antidepressant drugs for Josh.

In June 2002, approximately 1 month before his suicide, Josh went to a Joplin, Missouri, hospital. He stated that he was depressed and suicidal. Josh was transferred to the Freeman Hospital in Joplin and remained there for about 1 week. Dr. Zuberi treated Josh while at Freeman Hospital. Dr. Zuberi testified that when Josh was discharged from the hospital on June 25, 2002, he was feeling better and there was no indication that he was suicidal. Dr. Zuberi did not believe Josh was a danger to himself or others.

In March 2004, Josh's parents sued JSC for wrongful death and for a survival action on behalf of Josh's estate. The Pembertons asserted wrongful death claims under the theories of negligence per se and negligent entrustment. The negligence per se claim was based on an alleged violation of 18 U.S.C. § 922 by JSC's employees.

JSC moved for summary judgment. The district court granted summary judgment in JSC's favor on all claims. The district court found that there was no evidence that the federal firearms act was violated in the sale of the shotgun. The court determined that this holding undermined both negligence theories as a matter of law.

The district court also granted judgment in JSC's favor on the survival claims because the evidence indicated that Josh experienced little or no pain or suffering before his death.

I. *Did the District Court Err in Finding the Negligence Per Se Claims Failed as a Matter of Law?*

On appeal, the Pembertons contend that the district court erred in finding that the federal firearms statute, 18 U.S.C. § 922, was not violated by JSC's employees and that their negligence per se claim failed as a matter of law. Setting out the elements of negligence per se, our Supreme Court stated:

" 'The elements of negligence per se are (1) a violation of a statute, ordinance, or regulation, and (2) the violation must be the cause of the damages resulting therefrom. In addition, the plaintiff must also establish that an individual right of action for injury arising out of the violation was intended by the legislature.' [Citation omitted.]" *Pullen v. West*, 278 Kan. 183, 194, 92 P.3d 584 (2004).

In this case, the district court did not specifically address whether a private right of action existed under 18 U.S.C. § 922. Instead, it simply found that § 922 was not violated. The Pembertons contend that this conclusion was incorrect. JSC contends that the district court was correct. Moreover, JSC argues that there is no private right of action under the federal statute.

This court's standard of review of a summary judgment ruling is well established.

" ' "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. . . . On appeal, [an appellate court must] apply the same rules and where . . . reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." [Citations omitted.]' " *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 788, 107 P.3d 1219 (2005).

*Is there a Private Right of Action?*

In order for a person injured by a statutory violation to recover damages, there must be a private right of action. A private right of action exists if the legislature intended to give such a right. *Pullen*, 278 Kan. at 194. Whether a private right of action exists under a statute is a question of law. *Nora H. Ringler Revocable Family Trust v. Meyer Land and Cattle Co.*, 25 Kan. App. 2d 122, 126, 958 P.2d 1162, *rev. denied* 265 Kan. 886 (1998) (hereinafter *Ringler*). An appellate court reviews questions of law de novo. See *Griffin v. Suzuki Motor Corp.*, 280 Kan. 447, 451, 124 P.3d 57 (2005) (under facts of the case, admissibility of evidence involved a question of law and allowed unlimited review).

Kansas courts generally use a two-part test to determine whether a private right of action was intended to be created in a statute. First, the party must show that the statute was intended to protect a specific group of people rather than protecting the general public. Second, the court must review legislative history of the statute to determine whether a private right of action was intended. *Pullen*, 278 Kan. at 194. This court has recognized that Kansas law on private rights of action is similar to the principles of *Cort v. Ash*, 422 U.S. 66, 78, 45 L. Ed. 2d 26, 95 S. Ct. 2080 (1975). See *Ringler*, 25 Kan. App. 2d at 126.

The Tenth Circuit Court of Appeals has recognized, however, that the four-part test of *Cort v. Ash* has been condensed by the federal courts to simply determining whether Congress, expressly or by implication, intended to create a private cause of action. *Sonnefeld v. City and County of Denver*, 100 F.3d 744, 747 (10th Cir. 1996), *cert. denied* 520 U.S. 1228 (1997). Under recent federal cases, a federal court, when determining whether Congress intended to create a private right of action, must look for " 'rights-creating language' " which " 'explicitly confer[s] a right directly on a class of persons that include[s] the plaintiff' " and language identifying "the class for whose especial benefit the statute was enacted." *Boswell v. Skywest Airlines, Inc.*, 361 F.3d 1263, 1267 (10th Cir. 2004) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 288, 149 L. Ed. 2d 517, 121 S. Ct. 1511 [2001], and *Cannon v. University*

*of Chicago,* 441 U.S. 677, 688, n.9, 60 L. Ed. 2d 560, 99 S. Ct. 1946 [1979]).

The federal statute, 18 U.S.C. § 922(d), provides in relevant part:

"(d) It shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person—

(1) is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

(2) is a fugitive from justice;

(3) is an unlawful user of or addicted to any controlled substance . . . ; [and]

(4) *has been adjudicated as a mental defective or has been committed to any mental institution."* (Emphasis added.)

Anyone who knowingly violates 18 U.S.C. § 922(d) is subject to fines and imprisonment of not more than 10 years. 18 U.S.C. § 924(a)(2) (2000).

This federal statute was enacted as part of Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. 90-351, 82 Stat. 228 and was amended that same year by Title I of the Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1216. Title IV of the Omnibus Crime Control Act noted the number of murders and crimes committed with guns. 1968 U.S.C.C.A.N. 2163-64. Congress was concerned that the traffic in firearms moving in interstate commerce prevented states from adequately controlling firearms traffic within their own borders. Moreover, the availability of firearms to criminals, juveniles, drug addicts, mental defectives, and militant groups was found to be a significant factor in the prevalence of lawlessness and violent crime in the United States. Consequently, restrictions on transfers and sales of firearms were deemed necessary. 1968 U.S.C.C.A.N., 2197-98. The Gun Control Act of 1968 amended Title IV to subject rifles and shotguns to the same restrictions imposed on other firearms. 1968 U.S.C.C.A.N. 2197, 4412-13.

Under the federal standard for determining a private right of action, there is no legislative language in 18 U.S.C. § 922 or the accompanying provisions which can be classified as " 'rights-creating language' " which explicitly conferred a right directly to a class of persons that includes the plaintiffs or language identifying the

class for whose *especial* benefit the statute was enacted. See *Boswell*, 361 F.3d at 1267. As discussed above, the legislative history of the two federal enactments focuses on protecting the public *in general* from crime and violence created by the ready availability of firearms. While the laws were focused at keeping firearms out of the hands of felons and irresponsible persons, the protection was aimed at society in general. See *Huddleston v. United States*, 415 U.S. 814, 824-25, 39 L. Ed. 2d 782, 94 S. Ct. 1262 (1974) (discussing legislative history of § 922 in context of appeal from a criminal prosecution for unlawful possession). Based upon the federal private right of action analysis set forth in *Boswell*, no private right of action would exist under 18 U.S.C. § 922.

Recent Kansas appellate decisions consistently look at the legislative history of legislation and evaluate whether the applicable statute is "designed to protect a specific group of people, not just designed to protect the general public with incidental consideration given to the protection of a certain group." *OMI Holdings, Inc. v. Howell*, 260 Kan. 305, 340, 918 P.2d 1274 (1996) (criminal embracery statute protects the sanctity of the trial process and the general public, not just parties in litigation); *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 370-73, 819 P.2d 587 (1991) (statute requiring certain professionals to report any suspicion of child abuse did not create private right of action); *Brunett v. Albrecht*, 248 Kan. 634, 642, 810 P.2d 276 (1991) (no private right of action under Real Estate Brokers' and Salespersons' License Act; Act protects general public and stated it did not create a new right of action); see also *Schlobohm v. United Parcel Service, Inc.*, 248 Kan. 122, Syl. ¶ 1, 804 P.2d 978 (1991) (a plaintiff must show that the legislature intended to establish a private right of action and proof of violation of the statute); *Ringler*, 25 Kan. App. 2d at 129-32 (legislative history reflects intent to protect neighbors of livestock feedlot facilities; private right of action for injunctive relief permitted); *Jack v. City of Wichita*, 23 Kan. App. 2d 606, 611, 933 P.2d 787 (1997) (Wichita Flood Damage Prevention Code not designed to protect any individual class of plaintiffs but to protect general public); *Cf. Kerns v. G.A.C., Inc.*, 255 Kan. 264, 282, 875 P.2d 949 (1994) (the absence of an

express legislative intent will not bar creation of an individual right of action when a ordinance is enacted to protect a special class of persons: those who gain access to a closed pool and require rescuing, a class which included plaintiff).

The Pembertons rely on a number of out-of-state cases to argue that a majority of states recognize a private right of action for violations of 18 U.S.C. § 922. Nevertheless, many of those states did not apply a legal analysis similar to the federal or the Kansas standards in deciding whether a private right of action existed. Several of the decisions were based upon state statutes or common-law rules that broadly permit negligence per se claims based upon any statutory violation. See, *e.g.*, *Hetherton v. Sears, Roebuck & Co.*, 593 F.2d 526, 529 (3d Cir. 1979) (allowing negligence per se claim for violation of state weapons statute; under Delaware law, violation of a statute enacted for the safety of others is negligence per se); *Martin v. Schroeder*, 209 Ariz. 531, 536, 105 P.3d 577 (Ct. App. 2005) ("A duty of care and the attendant standard of conduct can . . . be found in a statute even though the statute is silent on the issue of civil liability."); *Franco, Admn'x v. Bunyard*, 261 Ark. 144, 147, 547 S.W.2d 91 (1977) (violation of statute or valid regulation is ordinarily evidence of negligence); *Coker v. Wal-Mart Stores, Inc.*, 642 So. 2d 774, 776 (Fla. Dist. App. 1994) (recognizing violation of § 922 constitutes negligence per se if the state where the sale occurs recognizes that violation of a penal statute is negligence per se); *Rubin v. Johnson*, 550 N.E.2d 324, 329 (Ind. App. 1990) (where state firearms statute is enacted to ensure the safety of others, its violation constitutes negligence per se).

Although one case cited by the Pembertons considers who 18 U.S.C. § 922 is intended to protect, it fails to distinguish between statutes enacted to protect the general public and statutes enacted to protect a specific class of persons. See *King v. Story's Inc.*, 54 F.3d 696, 697 (11th Cir. 1995) (citing prior decision recognizing private right of action; prior decision, *Decker v. Gibson Products Co. of Albany*, 679 F.2d 212, 214 [11th Cir. 1982], relied on state law which allows adoption of statute as a standard of conduct and finding victims were intended to be protected).

Conversely, other states have rejected the arguments made by the Pembertons. See *Hulsman v. Hemmeter Dev. Corp.*, 65 Hawaii 58, 67-68, 647 P.2d 713 (1982) (neither the statute nor the legislative history of § 922 reveal an intent to create civil liability for injuries sustained in firearms misuse); *Lewis v. Jamesway Corporation*, 291 App. Div. 2d 533, 534, 737 N.Y.S.2d 657 (2002) (federal Act does not create a private right of action for victims injured by firearms obtained in violation of § 922); *Rains v. Bend of the River*, 124 S.W.3d 580, 591 (Tenn. App. 2003) (expressing "substantial doubt" that § 922 was intended to create a private civil cause of action to unlawful sale of ammunition to 18 year old); *Olson v. Ratzel*, 89 Wis. 2d 227, 248-50, 278 N.W.2d 238 (1979) (principles of ordinary care rather than statutory standard determines liability in negligence case; legislative history insufficient to permit a negligence per se claim for violation of § 922).

The analysis applied in the latter group of cases is more consistent with the approach that Kansas courts have employed in evaluating negligence per se issues. It is apparent that no private right of action would exist under Kansas' two-part analysis. The legislative history of 18 U.S.C. § 922 contains no implication that Congress was attempting to create a private right of action if the federal criminal statute was violated. Moreover, nothing in § 922 reflects that it was designed to protect a specific group of people. Instead, it clearly was enacted to protect the general public. See *OMI Holdings, Inc.*, 260 Kan. at 340.

The Pembertons, however, assert that our Supreme Court has "tacitly approved" the use of gun and explosive sale statutes to support a claim of negligence per se, citing *Arredondo v. Duckwall Stores, Inc.*, 227 Kan. 842, 610 P.2d 1107 (1980). Nevertheless, the issue in *Arredondo* was whether the "comparative negligence statute applies in an action for personal injuries where liability is premised upon a violation of a statute prohibiting sale of explosives to minors." 227 Kan. at 842. There was no discussion in *Arredondo* whether the plaintiff could bring a negligence per se claim. To the contrary, the question was whether the minor victim's fault should be compared. Moreover, recently our Supreme Court held that violation of rules and regulations for the storage, use, and sales of

fireworks and firecrackers did not create a private cause of action and could not be a basis for a negligence per se claim. See *Pullen,* 278 Kan. at 199-201.

For these reasons, we determine that a private right of action does not exist under either the federal or Kansas laws.

*Did JSC Violate the Federal Firearms Statute?*

Even if we were to assume that a private right of action exists under 18 U.S.C. § 922, to assert a successful negligence per se claim, the Pembertons would have to establish that the statute was violated. See *Pullen,* 278 Kan. at 194. Section 922 makes it unlawful for anyone to sell a firearm to any person who "has been adjudicated as a mental defective or has been committed to any mental institution . . . ." 18 U.S.C. § 922(d)(4).

The statute does not define the terms used in § 922(d)(4). See 18 U.S.C. § 921 (2000) (definitions). In its regulations, however, the ATF defines various terms. "Adjudicated as a mental defective" is defined as follows:

"*A determination by a court, board, commission, or other lawful authority* that a person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease: (1) Is a danger to himself or to others; or (2) Lacks the mental capacity to contract or manage his own affairs." (Emphasis added.) 27 C.F.R. § 478.11, p. 20 (2005).

Likewise, "[c]ommitted to a mental institution" is defined as:

"A formal commitment of a person to a mental institution *by a court, board, commission, or other lawful authority.* The term includes a commitment to a mental institution involuntarily. . . . *The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution.*" (Emphasis added.) 27 C.F.R. § 478.11, pp. 21-22 (2005).

The parties dispute whether Josh was ever "committed" within the meaning of 18 U.S.C. § 922. The Pembertons argue that Josh was committed to a mental institution by law enforcement on two separate occasions. They maintain that after Josh's third suicide attempt (where he took pills and called his mother to say goodbye), police "placed" him at the Shawnee Mission Medical Center. He was then transferred to Menninger's for long-term psychiatric care. Likewise, the Pembertons cite to the police involvement in

the Pittsburg water tower incident as a basis for alleging Josh was committed.

As to the first incident, the record reflects that police found Josh unconscious in his car and had him transported to the Shawnee Mission Medical Center. According to his father, Josh was admitted there "for medical purposes" to make sure the overdose did not cause any other medical problems. When asked if the Shawnee Mission admission was for psychiatric treatment, Dr. Pemberton testified that the admission was "for medical purposes" and to make sure Josh was "medically stable" because he could not be transferred to a psychiatric facility until he was medically stable. Dr. Pemberton believed that police had filed an affidavit putting a 72-hour hold on Josh because of the suicide attempt. Nevertheless, it was the Pembertons who had Josh admitted to Menninger's. They chose to do it voluntarily rather than involuntarily "to keep the courts and everything out of it."

Now we turn our attention to the water tower incident. A Pittsburg Police Department media release indicated that police had talked an unidentified 18-year-old man off the water tower and took him into "protective custody." Dr. Pemberton testified that police notified him of the incident and that the Pembertons were given the "option of taking [Josh] to Kansas City or they were going to send him to the state facility in Larned." Accordingly, the Pembertons took Josh back to the Research Psychiatric Hospital, where Josh voluntarily consented to admission.

The record does not include any of Josh's medical records from the Shawnee Mission Medical Center to support the assertion that law enforcement took action to commit Josh or to put a "hold" on him. Although Dr. Pemberton makes assumptions in his deposition testimony about what the records might contain, his deposition testimony does not establish that he had personal knowledge of such action. " '[A]n inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility.' [Citation omitted.]" *Lloyd v. Quorum Health Resources, LLC*, 31 Kan. App. 2d 943, 954, 77 P.3d 993 (2003) (speculative evidence insufficient to create a genuine issue of ma-

terial fact sufficient to avoid summary judgment in defamation case).

The record reflects, at most, that on one or two occasions police were involved with Josh and perhaps even threatened involuntary commitment procedures. On both occasions, the Pembertons or Josh or both opted for a voluntarily commitment instead.

Finally, the Pembertons argue that when Josh voluntarily admitted himself to the Freeman Hospital in 2002, he was in a locked unit. They emphasize that the treating psychiatrist testified that Josh was not free to leave the unit.

Dr. Zuberi testified that the Freeman Hospital unit in which Josh was placed was a locked unit. According to the psychiatrist, if a voluntary patient wants to leave against medical advice, the patient is evaluated to determine whether it is safe for him or her to leave. If the patient is considered safe, he or she is released. If the patient is not considered safe, the medical staff puts a 96-hour hold on the patient. Josh did not attempt to leave the Freeman Hospital against medical advice. There is no evidence that a "hold" was ever placed on Josh.

In criminal prosecutions under 18 U.S.C. § 922, the federal courts have looked at state mental health laws in determining whether a particular hospitalization constitutes a "commitment," which would make a person's possession of a firearm unlawful. See *United States v. Waters*, 23 F.3d 29, 31-32 (2d Cir. 1994) (reviewing New York mental hygiene statute to determine if defendant was "committed" within meaning of 18 U.S.C. § 922); *United States v. Giardina*, 861 F.2d 1334, 1335-36 (5th Cir. 1988) (whether the appellant was "committed" is a question of federal law, but reviewing court may seek guidance from state law); *United States v. Hansel*, 474 F.2d 1120, 1122-23 (8th Cir. 1973) (the court considered the mental health law of Nebraska in determining "commitment"). Once state law has addressed the general question, the federal court must then consider if the outcome is consistent with federal policy. *Waters*, 23 F.3d at 31.

Under Kansas law, a voluntary patient is entitled to be discharged from a treatment facility within 3 days of the patient's written request for discharge. When a voluntary patient makes a

request for discharge, notice may be given to various interested parties. K.S.A. 59-2951. Any person, including the head of the treatment facility, may move to seek the involuntary commitment of a voluntary patient. See K.S.A. 59-2952 *et seq.* Under these statutes, a voluntary patient *may* be detained for emergency observation, presumably to allow the facility or family to attempt an involuntary commitment. There is no indication that Josh was detained for any time after he requested to be discharged from any of his various voluntary commitments.

Similarly, K.S.A. 59-2953(a) permits a police officer to take into custody any person the officer reasonably believes is mentally ill and likely to cause harm to himself or others. The officer must transport the person to a treatment facility to be examined. Moreover, the person cannot be transported to a state psychiatric hospital without written authorization by a mental health professional. The person must be examined by medical personnel within 17 hours. If medical personnel believe that the person is "likely to be a mentally ill person subject to involuntary commitment for care and treatment," the officer must provide an application for emergency observation under K.S.A. 59-2954. If the medical staff does not believe that the person is subject to involuntary commitment, the officer must return the person to the place where he was taken into custody or to another appropriate place. K.S.A. 59-2953.

A facility seeking to admit and detain a person for emergency observation can obtain an ex parte emergency custody order issued by the district court or upon a written application of a law enforcement officer. K.S.A. 59-2954(a). Upon such a detention, the detained person must be advised of his right to immediately contact the person's attorney, guardian, personal physician, or psychiatrist. K.S.A. 59-2955. The person detained must be discharged no later than the close of business of the first day the district court is open after the admission, unless a district court orders that such person remain in custody. K.S.A. 59-2956.

The Pembertons rely on *United States v. Chamberlain*, 159 F.3d 656 (1st Cir. 1998), to support their arguments. In *Chamberlain*, the defendant challenged his conviction under 18 U.S.C. § 922(g)(4) (prohibiting a person "committed to a mental institution"

from owning a firearm) on the grounds that his prior hospitalization was not a "commitment" under the federal statute. Before his arrest on the firearms charge, Chamberlain had put a loaded gun to his head and threatened his wife. He was involuntarily admitted to a hospital on an emergency basis based upon an application filed under the state mental health law. In the application, both a clinician and a licensed physician certified that Chamberlain had a mental illness and posed a likelihood of serious harm. A judge approved the application as required by state law. The involuntary admission was limited to a period of 5 days. At the end of that period, Chamberlain voluntarily committed himself. If he had not done so, the hospital could have sought an involuntary commitment order.

In *Chamberlain*, the federal court found the involuntary "admission" under Maine law constituted a commitment due to the fact the Maine Legislature used the term "admission" and "commitment" interchangeably. 159 F.3d at 661. In addition, the Maine Supreme Court had previously characterized an initial involuntary admission under the statute in question as a commitment. See 159 F.3d at 662. The federal court also found this determination was consistent with the policy under the federal enactment to keep firearms out of the possession of mentally unstable persons. 159 F.3d at 660. Because Chamberlain was "admitted" through a statutory process, that case is clearly distinguishable from the facts present in this case. As a result, the Pemberton's reliance on *Chamberlain* is misplaced.

Under the circumstances of this case, the Pembertons have failed to establish that Josh was committed under Kansas law. While an officer can take a person into protective custody and transport the person to be evaluated to a hospital, the person must be released unless medical personnel attest that the person is mentally ill and a danger to himself or others. In this case, there is no evidence that any effort was made to file an application for emergency observation when Josh was admitted to the Shawnee Mission Medical Center or to file an application for emergency observation at any other time. Absent such finding and application, Josh would have been entitled to be released upon request. See K.S.A. 59-

2953. Likewise, Dr. Pemberton's testimony reflects that Pittsburg police turned Josh over to his parents, rather than taking him to a hospital. Moreover, Josh never attempted to leave the Freeman Hospital against medical advice. Consequently, no emergency hold was placed on him there.

We found no authority to support a contention that a person is "committed" within the meaning of 18 U.S.C. § 922 simply because he has voluntarily committed himself or is voluntarily admitted by a guardian. Moreover, we could not find any case law indicating that someone who is voluntarily committed is considered "committed" under § 922 if there is evidence involuntary proceedings would have been commenced had that person attempted to leave treatment.

The ATF regulations state that voluntary commitments or detentions for observation are not to be considered a "commitment" within the meaning of 18 U.S.C. § 922. As our Supreme Court has observed, deference to an agency's interpretation of a statute is appropriate when the agency is one of special competence and experience.

"The interpretation of a statute by an administrative agency charged with the responsibility of enforcing a statute is entitled to judicial deference and is called the doctrine of operative construction. Deference to an agency's interpretation is particularly appropriate when the agency is one of special competence and experience. Although an appellate court gives deference to the agency's interpretation of a statute, the final construction of a statute lies with the appellate court, and the agency's interpretation, while persuasive, is not binding on the court. [Citation omitted.]" *In re Appeal of United Teleservices, Inc.*, 267 Kan. 570, 572, 983 P.2d 250 (1999).

The doctrine of operative construction also applies to federal statutes. See *Chevron, U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 843-44, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984) (courts defer to an agency's interpretation if it is reasonable and does not contradict the clear intent of Congress).

Based on the record before this court and the district court, there is no evidence to establish that Josh was "committed" within the meaning of 18 U.S.C. § 922.

*Was there Reason to Believe that Josh had been Committed?*

Even if Josh were not committed, the Pembertons contend that under the facts, JSC's employees had "reasonable cause to believe" that Josh had been committed. They argue that Josh's initial affirmative answer to question 12(f) of the ATF form creates such reasonable cause. In addition, they contend that the actions of the sales persons after the sale, in calling Josh on a pretense and attempting to get him to return to the store, supports a basis to conclude that reasonable cause existed to believe that Josh had been committed.

The Pembertons rely on 12 U.S.C. § 4003(c)(1) (2000) that defines "reasonable cause to believe" as "the existence of facts which would cause a well-grounded belief in the mind of a reasonable person." That statute involves federal banking law setting forth the expedited funds availability requirements imposed on federal banks. Section 4003 permits a bank to decline to make funds deposited in a new account immediately available if the bank has "reasonable cause to believe that the check is uncollectible from the originating depository institution." 12 U.S.C. § 4003(c)(1). This banking statute is hardly analogous to 18 U.S.C. § 922, a federal criminal statute.

In enacting 18 U.S.C. § 922, Congress clearly wanted to regulate and restrict the transfers and sales of firearms. Congress criminalized the sales of guns to persons who had, in the past, been adjudicated or involuntarily committed. Congress, however, could have written § 922 to preclude the sale of firearms to any person the seller had reason to believe, at the time of the sale, was a danger to self or to others. Nevertheless, § 922 was not written in that fashion. Congress may not have imposed such a requirement because it would have been difficult for laypersons to ascertain when a person is dangerous to himself or to others. Yet, whether a person has been adjudicated or involuntarily committed can easily be verified. Moreover, Josh's psychiatrist testified that it would be difficult for a layperson to judge whether a person has bipolar disorder and whether such a person is in a very depressive state.

As JSC points out, criminal statutes are strictly construed in favor of the criminal defendant. See *United States v. Levine*, 41 F.3d

607, 610-11 (10th Cir. 1994) ("Criminal statutes will not be construed to include anything beyond their letter . . . [but] should not 'be construed so strictly as to defeat the obvious intention of the legislature.' "); *State v. Rupnick*, 280 Kan. 720, 735, 125 P.3d 541 (2005) (" 'Criminal statutes must be strictly construed in favor of the accused. Any reasonable doubt about the meaning is decided in favor of anyone subjected to the criminal statute.' "). Although this is a tort claim, the claim is predicated upon the violation of a criminal statute.

Under the circumstances, interpreting 18 U.S.C. § 922 to criminalize the sale of a firearm to a purchaser whom the seller has "reasonable cause to believe that the purchaser has been voluntarily institutionalized" would be contrary to the plain meaning of the statute. The Pembertons attempt to inject this vague "reasonable cause to believe that a purchaser has been voluntarily institutionalized" standard is devoid of authority. As stated previously, for a 18 U.S.C. § 922 violation to have occurred, the seller would have had to know or had reasonable cause to believe that the purchaser had been adjudicated as a mental defective or had been involuntarily committed to a mental institution. Accordingly, it would run counter to reason to find a negligence per se claim existed even though the statute had not been violated.

In a negligence per se claim, the plaintiffs must establish (1) that a violation of the statute, ordinance, or regulation has occurred and (2) that the violation caused the damages claimed. *Pullen v. West*, 278 Kan. 183, 194, 92 P.3d 584 (2004). Plaintiffs also must establish that the statute explicitly or implicitly established a private cause of action. Under the circumstances, the Pembertons have failed to establish that 18 U.S.C. § 922 was intended to create a private cause of action or that JSC violated § 922. Accordingly, the district court properly granted summary judgment on this claim.

II. *Did the District Court Err in Finding That the Negligent Entrustment Claims Failed as a Matter of Law?*

The district court also granted summary judgment to JSC on the Pembertons' negligent entrustment claims. The district court concluded that no basis existed for the negligent entrustment claims

absent proof of a violation of 18 U.S.C. § 922. The Pembertons contend that sufficient evidence existed that a reasonable person could find JSC's employees negligently entrusted the shotgun to Josh under Restatement (Second) of Torts § 390 (1964).

*Does Negligent Entrustment Apply to Sales of Chattel?*

Under Kansas law, negligent entrustment initially was recognized as a tort based on "knowingly entrusting, lending, permitting, furnishing, or supplying an automobile to an incompetent or habitually careless driver." *McCart v. Muir*, 230 Kan. 618, 620, 641 P.2d 384 (1982). A duty exists not to give control of a dangerous instrumentality to a person who is incapable of handling or using it carefully. See 230 Kan. at 623. The tort appears to have been first recognized in *Priestly v. Skourup*, 142 Kan. 127, 45 P.2d 852 (1935). The *Priestly* court cited the Restatement (First) of Torts § 390 (1934), which stated:

" 'One who supplies directly or through a third person a chattel for the use of another whom the supplier knows, or from facts known to him should know, to be likely because of his youth, inexperience or otherwise, to use it in a manner involving unreasonable risk of bodily harm to himself and others whom the supplier should expect to share in, or be in the vicinity of its use, is subject to liability for bodily harm caused thereby to them.' " 142 Kan. at 130.

See Restatement (Second) of Torts § 390 (language almost verbatim).

Kansas has historically applied negligent entrustment principles to situations where an owner of a chattel has loaned or permitted access to the property by another. The vast majority of the cases are where the owner has permitted a known reckless or incompetent person to use his or her vehicle. See *Fogo, Administratrix v. Steele*, 180 Kan. 326, 328, 304 P.2d 451 (1956) (lending vehicle to known incompetent and reckless driver is basis for claim against lender); *Richardson v. Erwin*, 174 Kan. 314, 318, 255 P.2d 641 (1953) (same); *Pennington v. Davis-Child Motor Co.*, 143 Kan. 753, 757, 57 P.2d 428 (1936) (negligent entrustment could occur when an entruster knowingly supplies a car to an intoxicated person who thereafter harms a third person). Negligent entrustment of a vehicle has only been allowed when the entruster has a superior right

to control or possession of the vehicle. *Snodgrass v. Baumgart*, 25 Kan. App. 2d 812, 815-16, 974 P.2d 604, *rev. denied* 267 Kan. 887 (1999).

Kansas has never applied the negligent entrustment doctrine in the context of the *sales* of chattels. In fact, in *Kirk v. Miller*, 7 Kan. App. 2d 504, 644 P.2d 486, *rev. denied* 231 Kan. 800 (1982), this court held that once a vehicle is validly sold, the seller cannot be held to have negligently entrusted the vehicle to the buyer. 7 Kan. App. 2d at 508.

Nevertheless, the Restatement (Second) of Torts § 390, comment a, clearly states that it "applies to sellers, lessors, donors or lenders, and to all kinds of bailors . . . ." Many courts appear to have readily applied the negligent entrustment standards to sellers of firearms. See, *e.g.*, *Howard Bros. of Phenix City, Inc. v. Penley*, 492 So. 2d 965 (Miss. 1986) (duty found when retailer provided a pistol and ammunition, before completing forms, to a man who apparently was mentally deranged and under the influence of alcohol and drugs); *Rains v. Bend of the River*, 124 S.W.3d 580, 597-98 (Tenn. App. 2003) (merchants may be considered to be suppliers of chattels under Restatement § 390); *Bernethy v. Walt Failor's, Inc.*, 97 Wash. 2d 929, 931-33, 653 P.2d 280 (1982) (seller of gun to intoxicated person may be subject to liability under general duty not to supply chattel to another whom seller knows or has reason to know to be likely to use it in manner involving unreasonable risk of physical harm).

Yet, other courts appear reluctant to extend the negligent entrustment principles to sales transactions. See *Fluker v. Lynch*, 938 S.W.2d 659, 662 (Mo. App. 1997) (even if buyer appeared intoxicated at time of transaction to buy vehicle, and regardless of whether transaction was technically complete, dealership could not be held liable under negligent entrustment theory for accident occurring on following day); *Salinas v. General Motors Corp.*, 857 S.W.2d 944, 948 (Tex. App. 1993) (negligent entrustment liability did not apply to sellers because they could not control the car after sale and, thus, had no duty to ensure it was used safely).

Although the district court cited to the Restatement (Second) of Torts § 390, neither this court nor our Supreme Court has ever

applied the negligent entrustment principles from § 390 to a sales transaction.

JSC urges this court not to recognize a claim of negligent entrustment in this context. JSC contends that the regulation of firearms is a matter which should be left up to the legislature, which has enacted legislation regulating firearms. JSC also compares this issue to dram shop claims, which Kansas courts have long held should be recognized by the legislature rather than the judiciary. Finally, JSC notes that laws prohibiting discrimination against those with disabilities encumbers sellers when they are placed in a position to guess whether someone should be denied the right to purchase weapons because of a perceived disability.

We, however, need not determine whether a negligent entrustment claim can be asserted in a sales transaction. Because after making all inferences in the Pembertons' favor as required by K.S.A. 60-256, we determine that no genuine issues of material fact existed that JSC's employees had actual or constructive knowledge of Josh's mental problems or had actual or constructive knowledge that Josh was not capable of handling or using a shotgun appropriately.

The problem in analyzing negligent entrustment claims is the confusion surrounding the concept of foreseeability. In determining whether the defendant owed a duty to control the conduct of a third person, our Supreme Court has indicated there was no duty absent a showing the risk of harm was foreseeable. See *South v. McCarter*, 280 Kan. 85, 102-06, 119 P.3d 1 (2005). The court stated:

" ' "Foreseeability, for the purpose of proving negligence, is defined as a common-sense perception of the risks involved in certain situations and includes whatever is likely enough to happen that a reasonably prudent person would take it into account. [Citation omitted.] An injury is foreseeable *so as to give rise to a duty of care* where a defendant knows or reasonably should know that an action or the failure to act will likely result in harm." ' [Citations omitted.]" (Emphasis added.) 280 Kan. at 103-04.

Generally, whether a duty exists in a tort case is a question of law. 280 Kan. at 94.

In other contexts, however, our Supreme Court has addressed foreseeability as a fact question related to whether a duty was breached. For example, in *Long v. Turk*, 265 Kan. 855, 962 P.2d 1093 (1998), a failure to secure a dangerous instrumentality case, the question was whether the gun owners exercised the highest degree of care in securing their gun. "[W]hether the risk of harm is reasonably foreseeable is a question for the trier of fact. Only when reasonable persons could arrive at but one conclusion may the court decide the question as a matter of law." 265 Kan. at 865.

As the following cases show, whether a duty existed or whether a duty was breached, the liability of a gun seller generally turns on the facts of each case.

For example, in *Knight v. Wal-Mart Stores, Inc.*, 889 F. Supp. 1532 (S.D. Ga. 1995), Eric Brown was well known in his local Wal-Mart store; as he entered the store, a security code was announced for all departments. On the day in question, Brown entered the store and purchased a rifle. Brown falsely indicated that he had never been adjudicated mentally defective on the ATF form. The salesclerk escorted Brown out of the store with the rifle; another clerk at some point told the salesperson that Brown was "crazy." The second clerk then found the store manager and went outside to look for Brown, but he had left. Brown then purchased bullets at another store and went home and shot himself. In *Knight*, the district court rejected a negligence per se claim under the federal Act, 889 F. Supp. at 1537, but the court found there was a genuine issue of material fact as to whether the seller breached a duty under the Restatement § 390. 889 F. Supp. at 1539-41.

In *Phillips as Tutrix of Phillips v. Roy*, 431 So. 2d 849 (La. App. 1983), the Louisiana court found summary judgment was improperly granted to a firearms seller in a wrongful death case. There, a weapon was sold to Roy, a man with a long history of mental illness. The clerk denied knowing Roy before the transaction and testified that Roy showed no sign of mental illness. Roy also falsely denied having a mental illness on the ATF forms. Nevertheless, Roy's daughter and his mother testified that Roy was angry and cursing shortly before he purchased the gun, and they were concerned enough to contact police to look for Roy and to call a local judge

about a possible commitment. The court found that this evidence, coupled with the clerk's acknowledged lack of training, precluded summary judgment. 431 So. 2d at 851-53. See also *Cullum & Boren v. Peacock*, 267 Ark. 479, 481, 592 S.W.2d 442 (1980) (question of fact whether a duty of care was violated in selling a gun to person who wanted to "make a big hole in a man" and who otherwise acted strangely).

The Pembertons also rely on *Edmunds v. Cowan*, 192 Ga. App. 616, 618, 386 S.E.2d 39 (1989). In that case, however, a father was sued for failing to secure his pistol from his son. The father had knowledge that his son had two criminal convictions for breaking and entering and had one conviction for possession of a concealed handgun. Clearly, the *Edmunds* case is factually distinguishable from this case.

As JSC notes, various courts have held that firearm sellers were not negligent in circumstances similar or worse than those in the present case. For example, in *Jamison v. Dance's Sporting Goods, Inc.*, 854 F. Supp. 248 (S.D.N.Y. 1994), Gary Gee had a long history of mental illness: schizophrenia and depression. Gee purchased a pistol from the defendant's store after falsely indicating he had never been committed to a mental institution on the ATF form. In completing the form, however, Gee failed to follow the directions and placed his answers to the questions in the wrong location. Gee had stopped taking his medicine several weeks before and was known to become upset and agitated when he was not medicated. After the sale, Gee immediately mislaid the pistol and it was used later by an unknown person to kill a young child. The federal district court rejected the plaintiff's assertion that the mistake in filling out the form was evidence of mental deficiency sufficient to establish that the seller had reason to know of Gee's mental history. Likewise, the court noted that there was no evidence, other than the plaintiff's speculation, that Gee had acted unusual while in the store. 854 F. Supp. at 250.

Other cases have set fairly high standards for holding gun sellers liable, generally due to the difficulty in determining whether a purchaser was "mentally defective." For example, in *Jacoves v. United Merchandising Corp.*, 9 Cal. App. 4th 88, 118, 11 Cal. Rptr. 2d

468 (1992), a California court upheld a motion for judgment on the pleadings for the seller of a gun used by the purchaser to commit suicide. In that case, the pleadings alleged that the buyer had attempted to buy a handgun but left when he learned of the delay required by statute. The buyer returned to the same store later that day to buy a rifle. He was described as youthful, confused, distraught, and trembling. The California court found that the facts alleged above did not establish that the seller knew or had reason to know that the buyer was likely to use the rifle to harm himself. 9 Cal. App. 4th at 118. The court found that the buyer's alleged demeanor "was not on such a scale so as to manifest to the ordinary observer that [the buyer] was mentally impaired, incompetent or irresponsible with regard to the handling of firearms." 9 Cal. App. 4th at 119.

Other cases have reflected that serious behavioral indicators must be evident to establish a reasonable basis to believe that the buyer is a danger to himself or others. See, *e.g.*, *Martin v. Schroeder*, 209 Ariz. 531, 537, 105 P.3d 577 (Ct. App. 2005) (parents who gave gun to son knew he had used drugs in the past but believed he was not using them at the time of the transfer; no reasonable basis to believe that he was an "unlawful user" of drugs at time of transfer); *Drake v. Wal-Mart, Inc.*, 876 P.2d 738, 741 (Okla. App. 1994) (upholding summary judgment in favor of seller; buyer's timidity, nervousness, and fidgety behavior insufficient in light of her completion of ATF form and reasonable explanation for need for handgun was insufficient to create question of fact as to seller's knowledge); *Rains*, 124 S.W.3d at 586, 597 (illegal sale of ammunition to underage buyer without checking his age and without evidence of conduct that would give a basis to suspect buyer was not competent does not establish negligent entrustment); *Peek v. Oshman's Sporting Goods, Inc.*, 768 S.W.2d 841, 845 (Tex. App. 1989) (fact other customer testified purchaser appeared to be nervous, uptight, and in a hurry did not give seller reasonable cause to believe purchaser had been committed to mental institution).

In this case, the Pembertons take issue with the store clerks' actions, which they maintain led Josh to change his answers on the ATF form. They assert that Duncan acted inappropriately by ask-

ing Josh "twice" whether he understood question 12(f) and underlining the words in the question. They further assert that the ATF instructions only permit changes in answers upon the initiation of the transferee. Consequently, they infer that a seller cannot take any action. These assertions are not supported by the record.

First, nothing in Duncan's deposition supports the Pembertons' assertion that Duncan questioned Josh twice about whether he understood question 12(f). Duncan's deposition indicated that when he saw the affirmative response to the question, he asked Josh if he had understood the questions, turned the form around so Josh could read it again, and underlined some of the words. There is no reasonable inference that Duncan improperly coerced or enticed Josh to change his answer. Moreover, as discussed below, Josh's "revised" answer was proper under the ATF regulations.

Second, while the ATF instructions state that only the transferee can change an answer on the form, the instructions do not specifically prohibit the seller from simply asking whether the buyer understood the question. According to ATF instructions, an incorrect answer may be lined out, the correct answer written, and then initialed by the buyer. Even the Pembertons' expert testified that if the purchaser had made an inadvertent error in filling out the form, the buyer could correct it by completing a new form. The expert did not know if the ATF would object to having the purchaser cross out the incorrect answer and initial the correction. The expert also indicated that if a purchaser answered a question "Yes" that he or she had a prior felony conviction, the seller would simply ask the purchaser if he or she understood the question. The expert maintained that he has done this himself when someone affirmatively answered question 12(f).

The Pembertons point out that Pulliam told the investigating officer that at some point Josh seemed "anxious." Pulliam testified that he told the officer that Josh became anxious or nervous at some point during the sale. Later, Pulliam indicated that this anxiety was as if Josh was in a hurry. Pulliam compared Josh's anxiety to being late for class or work. The Pembertons assert that the clerks' testimony about Josh's demeanor was "self-serving." Nevertheless, an unsupported challenge to a witness' credibility is not

sufficient to create a genuine issue of material fact. *Brock v. Richmond-Berea Cemetery Dist.*, 264 Kan. 613, 623, 957 P.2d 505 (1998) (citing *Hamming v. Ford*, 246 Kan. 70, 75, 785 P.2d 977 [1990]).

The Pembertons presented no evidence that Josh's behavior in the store was so bizarre or unusual as to justify a finding that the sellers had reasonable cause to believe that Josh would be a danger to himself or to others. For example, the Pembertons brought forward no testimony from Josh's supervisor who had fired him earlier that morning or anyone else who saw Josh that day that he was acting in any fashion that should have raised a serious concern. *Cf. Knight*, 889 F. Supp. at 1540 (testimony of witnesses describing buyer's appearance as wild or in a rage created genuine issue of fact); *Phillips*, 431 So. 2d at 852 (mother testified she saw son shortly before his purchase of gun and he was in such a mental state she called a local judge seeking to have son detained until he could be committed to mental hospital).

The primary evidence upon which the Pembertons rely is the actions of Pulliam and Duncan in calling Josh after the sale and trying to talk him into returning to the store on a pretext in order to get another look at him. In *Knight*, the court found the salespersons' post-sale actions implying a belief that the sale was improvident, when coupled with evidence of the buyer's reputation and wild appearance on the morning of the sale, precluded summary judgment on a negligent sale claim. 889 F. Supp. at 1540.

Nevertheless, to impose liability on JSC, the Pembertons needed to show that JSC's employees had actual or constructive knowledge that Josh posed an unreasonable risk of harm to himself or to others. Consequently, our focus should not be on what kind of firearms purchaser Josh happened to be. Instead, our focus should be on what JSC's employees knew when they sold the shotgun to Josh. The facts show that JSC's employees had no reason to believe that Josh was incompetent to purchase a firearm.

Josh corrected the ATF form in an appropriate fashion under the ATF regulations. JSC employees ran his name through NICS and were told they could complete the sale. The only evidence about Josh's demeanor was that he was relatively calm and at some

point became somewhat in a hurry. There was no evidence that Josh was not competent to purchase the shotgun. Accordingly there was no negligent entrustment, and the issue concerning the survival claims is moot.

Affirmed.