IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

———————————————

THE PINAL COUNTY BOARD OF SUPERVISORS,
*Petitioner*,

*v.*

HON. JOSEPH R. GEORGINI, JUDGE OF THE SUPERIOR COURT OF THE
STATE OF ARIZONA, IN AND FOR THE COUNTY OF PINAL,
*Respondent*,

*and*

T.J.,
*Real Party in Interest*.

No. 2 CA-SA 2014-0010
Filed September 18, 2014

———————————————

Special Action Proceeding
Pinal County Cause No. S1100MH201000128

**JURISDICTION ACCEPTED; RELIEF GRANTED**

———————————————

COUNSEL

M. Lando Voyles, Pinal County Attorney
By Geraldine Roll and Rosemary Gordon-Pánuco,
Deputy County Attorneys, Florence
*Counsel for Petitioner*

Hernandez Scherb & Hanawalt, P.C., Florence
By Camille Hernandez

and

Paula M. Cook, Interim Pinal County Public Defender
By David T. Wilkison, Deputy Public Defender, Florence
*Counsel for Real Party in Interest*

---

**OPINION**

---

Presiding Judge Miller authored the opinion of this Court, in which Chief Judge Eckerstrom and Judge Vásquez concurred.

---

M I L L E R, Presiding Judge:

**¶1**      In this special action, the Pinal County Board of Supervisors challenges the respondent judge's appointment of the Pinal County Public Defender's Office (the PCPD), or any counsel at public expense, to represent real party in interest T.J. in a proceeding pursuant to A.R.S. § 13-925, to restore her right to possess firearms. We accept jurisdiction because the Board has no "equally plain, speedy, and adequate remedy by appeal," Ariz. R. P. Spec. Actions 1(a), and because the issue is purely legal, of statewide importance, and not previously addressed by Arizona courts. *See State ex rel. Romley v. Martin*, 203 Ariz. 46, ¶ 4, 49 P.3d 1142, 1143 (App. 2002). For the following reasons, we grant relief.

**Background**

**¶2**      In September 2010, the Pinal County Superior Court ordered T.J. to undergo combined inpatient and outpatient psychiatric treatment after finding she was a danger to herself and persistently or acutely disabled as a result of a mental disorder. The court appointed the PCPD to represent T.J. in the proceedings for court-ordered treatment, held pursuant to A.R.S. title 36, chapter 5, article 5. As a consequence of the court's findings and treatment order, T.J. is prohibited from possessing a deadly weapon or prohibited weapon, including a firearm, unless her "right to possess a firearm has . . . been restored pursuant to [A.R.S.] § 13-925." A.R.S. §§ 13-3101(A)(1),(7), 13-3102(A)(4).

2

¶3        T.J. was discharged from treatment by operation of law in September 2011.  *See* A.R.S. § 36-542(A).  In November 2011, the PCPD filed a petition to restore T.J.'s right to possess firearms pursuant to § 13-925, using the original mental health case number. That petition was dismissed without prejudice for unstated reasons; the following month the PCPD asked the court to appoint an independent evaluator to provide "appropriate information for judicial review of [T.J.'s] request to restore her right to possess firearms."

¶4        In July 2012, the respondent judge found T.J. indigent and appointed the PCPD to represent her, "pursuant to Title 36 and both the Arizona and United States Constitution[s] affording an indigent Patient counsel in this proceeding."  In September 2012, the respondent also approved T.J.'s renewed request for an expert's evaluation at public expense.

¶5        In April 2013, the PCPD filed a new petition for restoration of T.J.'s right to possess a firearm; in a reply, the state objected to the PCPD's representation of T.J. and argued the petition "should have been filed as a new civil matter by [T.J.] pro per or her private attorney, not by the [PCPD]."  After considering arguments on the issue, the respondent judge stayed the § 13-925 proceedings so the state could challenge the PCPD's appointment in a petition for special action.  The respondent judge also appointed private counsel to represent T.J "in any special action proceedings."  The Board has substituted as petitioner in this court and has adopted positions the state had asserted before the substitution.[1]

## Discussion

---

[1]A "county board of supervisors . . . is 'the body charged with establishing, employing and paying the public defender, [and therefore] appears to be the more appropriate party to complain of actions by the public defender which might be in excess of his authority.'"  *Smith v. Lewis*, 157 Ariz. 510, 512, 759 P.2d 1314, 1316 (1988), *quoting State v. Evans*, 129 Ariz. 153, 154, 629 P.2d 989, 990 (1981) (alteration in *Lewis*).

**¶6** In Arizona, a person faces criminal liability "by knowingly . . . [p]ossessing a deadly weapon or prohibited weapon if such person is a prohibited possessor." A.R.S. § 13-3102(A)(4). A prohibited possessor includes "any person . . . [w]ho has been found to constitute a danger to self or to others or to be persistently or acutely disabled . . . pursuant to court order under [A.R.S.] § 36-540, and whose right to possess a firearm has not been restored pursuant to § 13-925." [2] § 13-3101(A)(7)(a). Although this prohibition operates automatically, that is, there is no statutory requirement that the mental health treatment order address firearms possession, T.J.'s treatment order advised her of the prohibition.

**¶7** Section 13-925 allows a person to petition the court that ordered her treatment for an order restoring her right to possess a firearm. § 13-925(A). She is entitled to a hearing, and must "present psychological or psychiatric evidence in support of the petition." § 13-925(C). She is required to serve the petition on the attorney for the state who appeared in the underlying case, and "[t]he state shall provide the court with [her] criminal history records, if any." § 13-925(B), (C). At the hearing, "[t]he court shall receive evidence on and consider the following before granting or denying the petition":

1. The circumstances that resulted in the person being a prohibited possessor as defined in § 13-3101[(A)(7)(a)]. . . .

2. The person's record, including the person's mental health record and criminal history record, if any.

---

[2] Section 36-540 authorizes a court to order involuntary treatment, including hospitalization, for a person whose "mental disorder" has caused both of these circumstances. *See In re Commitment of An Alleged Mentally Disordered Pers. MH 91-00558*, 175 Ariz. 221, 224-25 & n.5, 854 P.2d 1207, 1210-11 & n.5 (App. 1993).

3. The person's reputation based on character witness statements, testimony or other character evidence.

4. Whether the person is a danger to self or others, is persistently, acutely or gravely disabled or whether the circumstances that led to the original order, adjudication or finding remain in effect.

5. Any change in the person's condition or circumstances that is relevant to the relief sought.

6. Any other evidence deemed admissible by the court.

§ 13-925(C).

**¶8**        To obtain relief, a petitioner must prove by clear and convincing evidence that she "is not likely to act in a manner that is dangerous to public safety" and that "[g]ranting the requested relief is not contrary to the public interest." § 13-925(D). The court is required to issue findings of fact and conclusions of law supporting its ruling, § 13-925(E), and an order granting or denying the petition may be appealed, A.R.S. § 12-2101(A)(4)(d). If the petition is granted, "the original [mental health] order, finding or adjudication is deemed not to have occurred" for the purpose of applying the prohibited possessor statute. §§ 13-925(F); 13-3101(A)(7)(a).

**¶9**        In its petition for special action relief, the Board argues there is no statutory authority "for the Public Defender to provide representation to indigent persons seeking restoration of their firearm rights" and "there are no constitutional, due process or other interests served by appointing counsel at taxpayers' expense for indigent persons seeking restoration of their firearm rights."[3]

---

[3]The record supports the Board's assertion that the respondent judge "also considered [whether] court appointed counsel would be appropriate if the public defender could not statutorily represent

## A.   The Absence of Statutory Authority

**¶10**        The Board points out that § 13-925 contains no express provision for the appointment of counsel.  It maintains statutes that expressly authorize such appointments "provide guidance on when the legislature intended that an indigent is entitled to counsel at taxpayer expense."   The Board also relies on *Trebesch v. Superior Court* and other cases for the proposition that "[A.R.S. §] 11-584 is clear and unambiguous and prohibits public defenders from defending persons outside the scope of the statute."  175 Ariz. 284, 288, 855 P.2d 798, 802 (App. 1993).

**¶11**        T.J. maintains §  11-584(A)(3)  authorizes the PCPD's appointment.  This statute permits a public defender to represent indigent parties who are "entitled to counsel as a matter of law" in "[m]ental disorder hearings only if appointed by the court under title 36, chapter 5."   But chapter 5 in title 36 governs mental health services and authorizes the appointment of counsel only when (1) a court grants a petition for a court-ordered, custodial evaluation of a proposed patient upon finding reasonable cause to believe that he or she "is, as a result of a mental disorder, a danger to self or others, [and] has a persistent or acute disability or a grave disability,"[4] A.R.S. §  36-529(A), (B); (2) a patient is detained pursuant to a petition for court-ordered treatment, A.R.S. § 36-535(A); (3) a patient is served with a petition for court-ordered treatment, A.R.S. § 36-536(A); or (4) a patient receiving treatment under a court order requests release, A.R.S. § 36-546(F).  The respondent judge did not

---

T.J."    Thus, although the Board maintains the respondent judge "exceeded [his] legal authority" in appointing the PCPD, it also seeks a broader determination prohibiting the "use of public funds to provide T.J. with legal representation at taxpayer expense." Because special action proceedings encompass issues of prohibition, as well as issues of certiorari, Ariz. R. P. Spec. Actions 1(a), we consider both issues in this decision.

    [4] "'Mental disorder' means a substantial disorder of the person's emotional processes, thought, cognition or memory. . . ." A.R.S. § 36-501(24).

appoint the PCPD under any circumstances authorized under title 36, chapter 5.

¶12　　　Moreover, we recognize that, as T.J. suggests, a hearing pursuant to § 13-925 requires consideration of the circumstances that led to court-ordered mental health treatment and whether those circumstances "remain in effect," as well as evidence regarding "[w]hether the person is a danger to self or others, [or] is persistently, acutely or gravely disabled." § 13-925(C)(1), (4). But in contrast to a "mental disorder" hearing pertaining to the provision of "Mental Health Services" under title 36, § 13-925 does not require a determination of whether a person suffers from a mental disorder; restoration of T.J.'s firearm rights instead depends on whether she "is not likely to act in a manner that is dangerous to public safety" and whether eliminating her firearms restriction "is not contrary to the public interest." *Compare* § 13-925(D) *with* § 36-540(A). Accordingly, we decline to construe a § 13-925 proceeding as a "mental disorder hearing" encompassed by the PCPD's previous, completed appointment pursuant to § 36-536.

¶13　　　We nonetheless are unable to resolve, based solely on statutory analysis, whether the respondent judge abused his discretion in appointing the PCPD to represent T.J. Although *Trebesch* and other cases cited by the Board correctly state the law, § 11-584(A)(10) since has been amended to authorize the PCPD to represent an indigent party "in any other proceeding or circumstance in which a party is entitled to counsel as a matter of law" if appointed by the court and approved by the county board of supervisors. *See* 2010 Ariz. Sess. Laws, ch. 195, § 1. Because we assume that § 11-584(A)(10) would encompass the PCPD's representation, with Board approval, of those persons entitled to counsel as a matter of constitutional due process, we must address whether due process requires the appointment of counsel for an indigent party in a § 13-925 proceeding.

**B.　Due Process**

¶14　　　"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of

the Fifth or Fourteenth Amendment," *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976), but the particular process due "varies in relation to the interests at stake and the nature of the governmental proceedings," *Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 36-37 (1981). "Liberty interests protected by the Due Process Clause may arise from the clause itself or state laws." *Wigglesworth v. Mauldin*, 195 Ariz. 432, 435, 990 P.2d 26, 29 (App. 1999).

### The Nature of T.J.'s Interest

**¶15** Arguing that due process does not require that counsel be appointed to represent T.J. at public expense, the Board relies on the "presumption that there is no right to appointed counsel in the absence of at least a potential deprivation of physical liberty." *Lassiter*, 452 U.S. at 31. The Board maintains "[t]he distinction between infringement of a fundamental right to personal liberty and a mere restoration of an interest in property, as is the case here, is markedly clear."

**¶16** But the presumption identified in *Lassiter* is not dispositive. In addressing whether due process requires the appointment of counsel for an indigent parent in proceedings to terminate parental rights, the Court in *Lassiter* approved the following case-by-case analysis to be conducted, "in the first instance" by the trial court: The court first "must balance" the three elements propounded in *Mathews*—"the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions"—"against each other, and then set their net weight in the scales against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom." *Id.* at 27, 31-32; *see also State ex rel. Corbin v. Hovatter*, 144 Ariz. 430, 431, 698 P.2d 225, 226 (App. 1985) ("[u]nless the individual's interests are strong, the state's interests weak, and the risk of error high, it cannot be said that due process requires the appointment of counsel" for civil litigant).

**¶17** Moreover, we agree with the PCPD that T.J.'s interest in her § 13-925 proceeding does not appear to be a "mere . . . interest in property." In *District of Columbia v. Heller*, the Supreme Court relied on textual and historical analysis to conclude the Second

Amendment codified a "pre-existing," "individual right to keep and bear arms"; accordingly, the Court invalidated District of Columbia laws that amounted to "the absolute prohibition of handguns held and used for self-defense in the home." 554 U.S. 570, 592, 595, 636 (2008). In *McDonald v. City of Chicago*, the Court concluded the "personal right to keep and bear arms for lawful purposes" is "among those fundamental rights necessary to our system of ordered liberty" and, therefore, the Second Amendment's prohibition against infringement of that right applies equally to the states.[5] 561 U.S. 742, ___, __, __, 130 S. Ct. 3020, 3042, 3044, 3050 (2010). Thus, as the respondent judge observed, it would seem—at least at first glance—that T.J.'s petition implicates a "Second Amendment right[] . . . guaranteed under the United States Constitution."

¶18         But the Court in *Heller* also explained,

> Like most rights, the right secured by the Second Amendment is not unlimited. . . . Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and

---

[5] The Second Amendment right recognized in *Heller* and *McDonald* thus falls within the ambit of the liberty guaranteed by the Due Process Clause, which "denotes not merely freedom from bodily restraint but also the right of the individual . . . to marry, establish a home and bring up children, . . . and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

> qualifications on the commercial sale of arms.

554 U.S. at 626-27 (citations omitted). The Court then added, "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26.

**¶19** Although there have been many post-*Heller* cases, we have found little discussion of what due process requires after these permissible, categorical restrictions are imposed. A few courts have addressed the process required to suspend firearm rights. For example, in *United States v. Rehlander*, the First Circuit Court of Appeals relied on a due process analysis to reverse the convictions of two defendants charged with possessing a firearm in violation of 18 U.S.C. § 922(g)(4), which prohibits possession by those "committed to a mental institution." 666 F.3d 45, 50 (1st Cir. 2012).

**¶20** The defendants in *Rehlander* had been hospitalized involuntarily under a Maine statute that "provides for temporary hospitalization following ex parte procedures—that is to say, without an adversary proceeding." *Id.* at 46-47, *citing* Me. Rev. Stat. tit. 34-B, § 3863 (2011). Although the First Circuit previously had held such hospitalization qualified as a "commit[ment]" subject to the prohibition in § 922(g)(4), the court in *Rehlander* reconsidered and abandoned that decision in light of *Heller* and pursuant to "the doctrine of constitutional avoidance." *Id.* at 47-48, 50-51, *overruling United States v. Chamberlain*, 159 F.3d 656 (1st Cir. 1998). The court concluded Maine's ex parte process for a three-day psychiatric hospitalization was insufficient, under due process principles, to effect a permanent deprivation of Second Amendment rights. *Id.* at 48-49. Acknowledging the Supreme Court's admonition that *Heller* "did not undercut traditional restrictions on the possession of arms by those who were mentally ill," the First Circuit concluded the Court also had not intended to "address[] a permanent ex parte deprivation of its newly recognized constitutional right" without "further protective procedures or remedies." *Id.* Accordingly, the court held "section 922 should not be read to encompass a temporary hospitalization attended only by the ex parte procedures" in Maine's statute. *Id.* at 49.

¶21    This case presents a much different question, because the mental health order was issued after the opportunity for adversary proceedings in which T.J. participated.  Instead, as the Board correctly observes, the principal issue here is "restoration" of her right to possess a firearm.  Due process requirements are triggered by governmental decisions that "deprive" an individual of liberty or property interests.  *See* U.S. Const., amend. XIV, § 1; *Mathews*, 424 U.S. at 332.  The government decision that formed the basis for T.J. being "deprive[d]" of her right to possess firearms was the September 2010 mental health adjudication and treatment order.  T.J. does not suggest those proceedings failed in any way to comply with statutory requirements or due process,  and no decision in a § 13-925 proceeding will cause any further deprivation of that interest.  And T.J. has not argued the Constitution requires an opportunity to restore liberty interests that already have been forfeited through a proceeding that fully comports with due process, nor has she cited any authority suggesting as much.  *Cf. Rehlander*, 666 F.3d at 46, 48-49 & n.4 (in dicta, perceiving no due process violation in permanent firearms disqualification based on civil commitment ordered after "traditional adversary proceeding" and "judicial determination" of both mental illness and dangerousness); *United States v. Marzzarella*, 614 F.3d 85, 92 (3d Cir. 2010) ("[T]he Second Amendment affords no protection for . . . possession [of firearms] by felons and the mentally ill.").[6]

¶22    Nonetheless, "[s]tates may under certain circumstances create liberty interests" entitled to due process protection, even if they involve no deprivation of liberty that would "'give rise to protection by the Due Process Clause of its own force.'" *Wilkinson v. Austin*, 545 U.S. 209, 221-23 (2005), *quoting Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).  For the purposes of our analysis, we conclude T.J.'s liberty interest arising from § 13-925 is a state interest created by Arizona law.  *See State v. Grant*, 24 Ariz. App. 201, 202, 537 P.2d

---

[6]In the absence of any argument or authority to the contrary, we assume, without deciding, that T.J. has no liberty interest in a § 13-925 proceeding anchored in the Constitution.

38, 39 (1975) ("Restoration of civil rights is a creature of statute."), *adopted*, 112 Ariz. 270, 540 P.2d 1251 (1975).

### Determination of Process Due for Restoration of Forfeited Rights

¶23      We have found no authority regarding the process that may be constitutionally required when a person seeks to restore civil rights that previously have been forfeited in accordance with due process. But authorities suggest there is only a limited due process interest in such proceedings. *See, e.g.*, *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009) (convict "has only a limited interest in postconviction relief," having "already been found guilty at a fair trial"); *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7, 12 (1979) (no constitutional right to release on parole, but state-created liberty interest may be "entitled to some measure of constitutional protection"). We are aware of no authority, and T.J. has cited none, suggesting that appointed counsel is required under such circumstances. *Cf. Pennsylvania v. Finley*, 481 U.S. 551, 556 (1987) (no constitutional right to appointed counsel in collateral challenge to criminal conviction).

¶24      Although these cases do not address the specific circumstance here, each of them demonstrates the limited nature of an expectancy interest in a proceeding to restore liberty that has already been forfeited in accordance with due process. Each of them also affords some deference to a state's promulgated procedures to protect the limited, state-created interests in proceedings to restore such rights. *See Osborne*, 557 U.S. at 69; *Finley*, 481 U.S. at 559; *Greenholtz*, 442 U.S. at 13. Unless the liberty in question involves freedom from restraint, as it did in *Osborne*, *Finley*, and *Greenholtz*, greater deference may be owed to state procedures designed to protect fundamental, but lesser interests. *Cf. Lassiter*, 452 U.S. at 26 ("[A]s a litigant's interest in personal liberty diminishes, so does his right to appointed counsel."). We conclude T.J. has a limited, state-created interest in a proceeding to restore her right to possess firearms.

The Nature of the Proceeding

**¶25** We next consider whether the procedures in § 13-925—which do not include the appointment of counsel for indigent petitioners—are "constitutionally sufficient" in light of "the governmental and private interests that are affected." *Mathews*, 424 U.S. at 334. We first examine the statutory procedures in place. T.J. characterizes the proceedings as "particularly complex," noting the requirements that she "present psychological or psychiatric evidence in support of the petition"—as well as evidence regarding the circumstances that led to her court-ordered treatment and any change in those circumstances, her mental health and criminal history records, and her reputation. She must "prove by clear and convincing evidence" that she "is not likely to act in a manner that is dangerous to public safety" and that "[g]ranting the requested relief is not contrary to the public interest." § 13-925(C), (D). She points out she has been diagnosed with a mental illness and suggests "having counsel present this matter" would not only benefit her, but would assist the court as well.

**¶26** In contrast, the Board argues the "legislature did not craft an onerous process in A.R.S. § 13-925, but rather a limited process to protect the public safety and interest." Thus, according to the Board,

> The statute requires psychological or psychiatric evidence which could be as simple as [a] note from an attending doctor opining that the petitioner's mental state is safe and stable such that it would be appropriate to restore firearm rights. The petitioner is able to present hearsay evidence regarding character and reputation.

**¶27** We recognize, as did the Court in *Lassiter*, that "[e]xpert medical and psychiatric testimony" is something few untrained persons "are equipped to understand and fewer still to confute." 452 U.S. at 30. But the ultimate subject of the hearing—whether T.J. is unlikely to act in a manner that endangers public safety or

13

compromises public interest—"is one as to which [she] must be uniquely well informed and to which [she] must have given prolonged thought." *Id.* at 29. Although a person "thought to be suffering from a mental disease or defect" may have "an even greater need for legal assistance," the Supreme Court has not required the appointment of counsel for prisoners facing involuntary transfer to a mental hospital, even though, unlike T.J., they "are threatened with immediate deprivation of liberty." *Vitek v. Jones*, 445 U.S. 480, 495-97 (1980). More important, given the interests at stake, a person who necessarily takes the position that she no longer suffers from a disabling mental condition and is now capable of responsibly possessing a deadly weapon has less need for assistance than one facing an involuntary commitment petition. Finally, "the fact that a particular service might be of benefit to an indigent [party] does not mean that the service is constitutionally required." *Ross v. Moffitt*, 417 U.S. 600, 616 (1974).

¶28 The Supreme Court has acknowledged that, in an adversary proceeding, "the contest of interests may become unwholesomely unequal" when only one party is represented by counsel. *Lassiter*, 452 U.S. at 28; *see also Turner v. Rogers*, ___ U.S. ___, ___, 131 S. Ct. 2507, 2519-20 (2011). But in proceedings that are less adversarial in nature, the Court has observed that "[t]he introduction of counsel" may "alter significantly the nature of the proceeding," particularly when the proceeding is designed to be "'predictive and discretionary' as well as factfinding." *Gagnon v. Scarpelli*, 411 U.S. 778, 787 (1973) (probation and parole revocation hearings), *quoting Morrissey v. Brewer*, 408 U.S. 471, 480 (1972).

¶29 As in *Gagnon*, the role of the decision maker in a § 13-925 hearing essentially is predictive and discretionary, and our review of the statute suggests the legislature did not contemplate a "full-blown adversary hearing," *United States v. Salerno*, 481 U.S. 739, 750 (1987); based on the statute's language, a § 13-925 hearing might not be adversarial at all. The statute requires a petitioner to "present psychological or psychiatric evidence in support of the petition" and describes types of evidence the court "shall receive . . . and consider" before ruling on the petition. § 13-925(C). In contrast, the statute does not require any similar "present[ation]" of evidence by the

state; instead, it requires only that the petition "be served on the attorney for the state who appeared in the underlying case," § 13-925(B), and that "[t]he state . . . provide the court with the person's criminal history records, if any," § 13-925(C). This language suggests the legislature contemplated a hearing that may be more investigatory than adversarial in nature, with the court assuming a "more active role with respect to the course of the hearing." *See* Henry J. Friendly, "*Some Kind of Hearing*", 123 U. Pa. L. Rev. 1267, 1288-89 (1975) (noting benefit of investigatory hearings in circumstances "where the disadvantages of the presence of counsel may outweigh the benefits").[7] Such an approach would seem appropriate to a § 13-925 hearing, which affords broad discretion to a court's predictions about a petitioner's future conduct. *See Gagnon*, 411 U.S. at 787.

¶30 Section 13-925 also affords significant procedural protections, including written findings in support of the decision and an opportunity for appellate review. §§ 12-2101(A)(4)(d), 13-925(E). Because "[n]o ideal, error-free way . . . has been developed" to make such subjective, predictive decisions, a § 13-925 proceeding is less likely to be driven by fact-finding and more likely to be "guided by the practical experience of the actual . . . decisionmakers in predicting future behavior." *See Greenholtz*, 442 U.S. at 13 (parole-release decisions). Under these circumstances, we cannot say the provision of counsel to indigent petitioners is necessary to reduce the risk of error. *See id.* ("[p]rocedures designed to elicit specific facts . . . not necessarily appropriate" to parole determination). Apart from the required psychological or psychiatric evidence[8] and the criminal history provided by the state, the other evidence to be considered by the court does not appear to

---

[7]Although more extensive, such a hearing might resemble that required for a determination of indigency pursuant to Rule 6.4, Ariz. R. Crim. P., in which the court, rather than the state, makes inquiry of the evidence and witnesses.

[8]We express no opinion on whether, as the Board suggests, a petitioner could satisfy this requirement by submitting documentary evidence.

"require either investigation or exposition by counsel." *Gagnon*, 411 U.S. at 787.

¶31 The state is not necessarily an opponent in the proceeding. It also has an interest in protecting the Second Amendment rights of citizens who are eligible to possess firearms, which co-exists with a duty to prevent those ineligible to possess weapons, by virtue of dangerousness resulting from mental illness, from doing so. Public safety includes citizens whose right to possess firearms has been suspended due to mental illness. In other words, appropriate opposition by the state to restoration of the right to possess a firearm will be in the best interest of a person whose mental illness would render its possession dangerous to her and others.

¶32 We also consider the cost of the procedural protections. Because § 13-925 limits neither the time frame in which a petition may be filed nor the number of times a petitioner may seek relief, the costs of providing counsel to all indigent petitioners seeking § 13-925 relief could be substantial. *Cf.* Cal. Welf. & Inst. Code § 8103 (person seeking relief from firearms disability, resulting from custodial placement for dangerousness "may make a single request for a hearing" during five-year disability period).

¶33 In balancing T.J.'s limited interest in restoring her right to possess firearms, and the unlikelihood that the provision of counsel would reduce error in the proceedings, against the state's interest in minimizing costs, T.J.'s desire for appointed counsel does not outweigh the presumption that appointed counsel will be provided only when personal liberty is at stake. *See Lassiter*, 452 U.S. at 26. We conclude § 13-925 provides all the process T.J. is due. *See Finley*, 481 U.S. at 558. She is not entitled to appointment of counsel as a matter of law.

## C.  The Interests of Justice

¶34 In the alternative, T.J. argues the respondent judge did not abuse his discretion in appointing the PCPD because appointment of counsel was warranted by "the interests of justice," Ariz. R. Crim. P. 6.1(b), in light of the complexities involved in

presenting her case. She maintains the interests of justice would also be served by her continued representation by the PCPD because of the PCPD's familiarity with her proceeding. But to the extent T.J. relies on Rule 6.1, that rule applies only to a "defendant" in a "criminal proceeding."

¶35 We agree with the Board that a proceeding to restore firearm rights pursuant to § 13-925 is civil in nature, notwithstanding the statute's placement in title 13. *See Greehling v. State*, 135 Ariz. 498, 499-500, 662 P.2d 1005, 1007 (1982) (motion for return of property pursuant to A.R.S. § 13-3922 "is civil in nature," notwithstanding placement in criminal code, "and an appeal from an adverse ruling would be governed by the law of civil appeals"). The civil nature of a § 13-925 proceeding is evinced by the legislature's provision for appeal in § 12-2101, which identifies appealable judgments and orders in civil proceedings.

¶36 Moreover, because T.J. is not "entitled to counsel as a matter of law," § 11-584(A)(10), the PCPD is not authorized to represent her. Of course, a court "has authority to require a lawyer's services, even on a pro bono basis, to assist in the administration of justice." *Scheehle v. Justices of the Supreme Court of the State of Ariz.*, 211 Ariz. 282, ¶ 40, 120 P.3d 1092, 1102 (2005). But our supreme court has held "a county is not liable for fees and disbursements to counsel assigned to [an indigent party] in the absence of statute regulating such compensation." *McDaniels v. State*, 62 Ariz. 339, 351, 158 P.2d 151, 156 (1945), *accord Haralambie v. Pima Cnty.*, 137 Ariz. 207, 210, 669 P.2d 984, 987 (App. 1983).

## Disposition

¶37 For the reasons stated, we accept jurisdiction of this special action and grant relief to the Board. We conclude the respondent judge abused his discretion in appointing the PCPD to represent T.J., who is not entitled to the appointment of counsel as a matter of law. Accordingly, we direct the respondent judge to relieve the PCPD of its appointment in this matter.